# CORRECTED NON-CONFIDENTIAL VERSION

## 2014-1454

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

THE TIMKEN COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES, NTN BEARING CORPORATION OF AMERICA, NTN-SNR ROULEMENTS S.A., SNR BEARINGS USA, INC.,

Defendants-Appellees,

MYONIC GMBH, NEW HAMPSHIRE BALL BEARINGS, INC.,

Defendants,

SCHAEFFLER ITALIA S.R.L., SKF USA INC., SKF INDUSTRIE S.P.A., SOMECAT S.P.A.,

Defendants-Appellees.

Appeal from the United States Court of International Trade in case nos. 12-cv-00415, 12-cv-00416 and 12-cv-00417, Judge Jane A. Restani.

### BRIEF FOR PLAINTIFF-APPELLANT
### THE TIMKEN COMPANY

Terence P. Stewart
Geert De Prest
Lane S. Hurewitz

Stewart and Stewart
2100 M Street, NW
Suite 200
Washington, DC  20037
(202) 785-4185
gdeprest@stewartlaw.com

Attorneys for Plaintiff-Appellant,
The Timken Company

July 16, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

The Timken Company v. United States

No. 2014-1454

CERTIFICATE OF INTEREST

(Federal Circuit Rule 47.4 and Form 9)

Counsel for the Plaintiff-Appellant, The Timken Company, certifies the following:

1.      The full name of every party or amicus represented by me is:

*The Timken Company*

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

*not applicable*

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

*The Timken Company is a publically-owned company. The Timken Company has no parent company and no publicly-held company is currently known to own a 10% or greater share. With the exception of 25% of the shares of Timken India, Ltd., and less than 1.1% of the shares of Timken Romania S.A., none of the subsidiaries are publically traded.*

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

*Stewart and Stewart: Terence P. Stewart, William A. Fennell, Geert De Prest, partners; Lane S. Hurewitz, of counsel*

_____/s/ Geert De Prest_____
Geert De Prest
Counsel for The Timken Company
STEWART AND STEWART
2100 M Street, NW
Washington, D.C.  20037
Telephone:  (202) 785-4185

Dated:  July 15, 2014

i

# Table of Contents

Confidential material is contained in brackets in the confidential version of this brief, and is omitted from the non-confidential (public) version of this brief, on pages 14-15, 20 and 37. The material reveals the contents of disclosure materials released under protective order by the U.S. Department of Commerce. The disclosure materials, in turn, identify customers and describes sales, pricing and other business proprietary information submitted by respondents NTN-France, myonic-Germany, Schaeffler-Italy and SKF-Italy in the administrative proceedings, and were accorded confidential treatment by the U.S. Department of Commerce and by the U.S. Court of International Trade.

STATEMENT OF RELATED CASES ............................................................... 1

JURISDICTIONAL STATEMENT ................................................................... 2

STATEMENT OF THE ISSUES ........................................................................ 2

STATEMENT OF THE CASE ............................................................................ 4

    Decisions below ............................................................................................ 4

    Modifications to Commerce's methodology for calculating weighted
        average margins ................................................................................... 5

    The Nails test ................................................................................................. 8

    Preliminary Results ..................................................................................... 11

    Applying the Nails Test ............................................................................... 13

    Timken's arguments before the agency ...................................................... 16

    Final results ................................................................................................. 17

    Decision of the Trade Court ........................................................................ 18

SUMMARY OF THE ARGUMENT ............................................................... 19

ARGUMENT .................................................................................................... 20

I.    Standard of Review ................................................................................ 20

**II. The agency departed from prior decisions without adequate explanation. ............................................................................................... 21**

    A.   Agencies must explain departures from previous norms ............................ 21

    B.   In several decisions, Commerce determined that the results of the Nails test should *not* be set aside based on a comparison of the volume and value of sales identified by the test with the total export sales of the respondent, and supplied detailed reasoning in support of those decisions. ........................................................................................... 23

    C.   Commerce's explanation did not address these prior decisions or their reasoning in any meaningful way. ...................................................... 27

    D.   The Trade Court's reasoning that Commerce's contrary decisions are not relevant because they only address the pattern determination elevates form over substance and was, in any event, not adopted by the agency. .................................................................................................... 30

**III. The agency's decision that the evidence revealed by the Nails test was insufficient to warrant consideration of alternative calculation methods constituted an abuse of its discretion. ........................................... 33**

    A.   The agency's discretion is not unfettered; it is bounded by the purpose of the law, which, in this instance, was to address masked dumping. ................................................................................................... 33

    B.   The record included Commerce's own alternative margin calculations, which demonstrated the extent of masked dumping. ............. 36

    C.   Commerce may set aside evidence as *de minimis*, but such decisions must be adequately explained and must be supported in the record. .......... 38

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT ......................... 41**

# Table of Authorities

## CASES

*Ad Hoc Committee v. United States*, 13 F.3d 398 (Fed. Cir. 1994) ........................ 32

*Alcan Aluminum Corp. v. United States*, 165 F.3d 898 (Fed. Cir. 1999) ............... 38

*Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365 (Fed. Cir. 2002) .......... 21

*Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 1174, 704 F. Supp. 1068 (1988) ........................................................ 29

*Atchison, Topeka & SFR Co. v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) ... 22, 29

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, Slip Op. 14-71 (Ct. Int'l Trade June 25, 2014) ......................................................... 8

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281 (1974) ......................................................................................... 37

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ...................... 32

*Carlisle Tire & Rubber Co. v. United States*, 1 CIT 352, 517 F. Supp. 704 (1981) ........................................................................................................ 38

*Carlisle Tire & Rubber Co. v. United States*, 10 CIT 301, 634 F. Supp. 419 (1986) ........................................................................................................ 39

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ........................ 37

*Committee for Fairly Traded Venezuelan Cement v. United States*, 372 F.3d 1284 (Fed. Cir. 2004) ................................................................................. 21

*CP Kelco Oy v. United States*, 978 F. Supp. 2d 1315 (Ct. Int'l Trade 2014) ........ 1, 8

*F. Lli De Cecco Di Filippo Fara S. Martino v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ........................................................................................ 33

*Freeport Minerals Company v. United States*, 776 F.2d 1029 (Fed. Cir. 1985) .................................................................................................... 21, 33

*Gallant Ocean (Thailand) v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ......... 34

*Grogan v. Barnhart*, 399 F.3d 1257 (10th Cir. 2005) .............................................. 32

*Humane Society of the United States v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ...... 22

*JBF RAK v. United States*, Slip Op. 14-78 (Ct. Int'l Trade July 1, 2014) ................ 8

iii

*Micron Technology, Inc. v. United States*, 19 CIT 829, 893 F. Supp. 21 (1995), *aff'd*, 117 F.3d 1386 (Fed. Cir. 1997) ....................................22

*Mid Continent Nail Corporation v. United States*, 712 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ...........................................................................8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................................................ 21, 22, 37

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009)................22

*NTN Bearing Corp. v. United States*, 368 F.3d 1369 (Fed. Cir. 2004) ...................20

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ............29

*Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194 (1947) .....................................................................................32

*Serampore Industries Pvt., Ltd. v. United States*, 11 CIT 866, 675 F. Supp. 1354 (1987) ..............................................................................34

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) ...........................21

*The Timken Company v. United States*, 968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014)......................................................................................2, 4

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004)................................34

*Timken Co. v. United States*, Slip Op. 14-51, Ct. No. 13-00069 (Ct. Int'l Trade May 02, 2014)....................................................................1

*Tung Mung Dev. Co. v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) ................22

*Union Steel v. United States*, 823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012), *aff'd*, 713 F.3d 1101(Fed. Cir. 2013) ..................................................40

*Washington Red Raspberry Comm'n v. United States*, 859 F.2d 898 (Fed. Cir. 1988) .............................................................................39

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................21

19 U.S.C. § 1673 ...............................................................................5

19 U.S.C. § 1675 ...............................................................................4

19 U.S.C. § 1677(35)(A)......................................................................5

19 U.S.C. § 1677(35)(B)......................................................................6

19 U.S.C. § 1677f-1(d)(1)(A)(i) ............................................................5

19 U.S.C. § 1677f-1(d)(1)(B) ........................................................ passim

19 U.S.C. § 1677f-1(d)(1)(B)(i)...................................................................13

19 U.S.C. § 1677f-1(d)(1)(B)(ii)..................................................................13

19 U.S.C. § 1677f-1(d)(2).........................................................................6, 7

28 U.S.C. § 1295(a)(5).................................................................................2

### OTHER AUTHORITIES

Agreement on Implementation of Article VI of the General Agreement on
    Tariffs and Trade 1994 (Apr. 15, 1994), *reprinted in* World Trade
    Organization, The Legal Texts: The Results of the Uruguay Round of
    Multilateral Trade Negotiations 147 (1999) ........................................35

Terence P. Stewart & Amy S. Dwyer, *Comparative Overview of Anti-
    dumping Regulations in the European Communities and the United States
    of America, in* 4 *WTO – Trade Remedies: Max Planck Commentaries on
    World Trade Law* (Martinus Nijhoff Publishers 2008) ......................41

Terence P. Stewart, *Introduction and Overview, in* 1 *The GATT Uruguay
    Round: A Negotiating History* (1986-1992) 96 (Terence P. Stewart ed.,
    Kluwer Law & Taxation Publishers 1993).........................................35

### RULES

Fed. Cir. R. 47.5(a) .....................................................................................1

Fed. Cir. R. 47.5(b) .....................................................................................1

### REGULATIONS

*Antidumping and Countervailing Duties; De Minimis Dumping Margins and
    De Minimis Subsidies*, 52 Fed. Reg. 30660 (Dep't Commerce Aug. 17,
    1987).......................................................................................................39

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping
    Margin and Assessment Rate in Certain Antidumping Duty Proceedings;
    Final Modification*, 77 Fed. Reg. 8101, 8102 (Dep't Commerce Feb. 14,
    2012)...................................................................................................7, 11

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping
    Margin During an Antidumping Investigation; Final Modification*, 71
    Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006) .............................6

ADMINISTRATIVE DETERMINATIONS

*Ball Bearings and Parts Thereof From France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010-2011*, 77 Fed. Reg. 73415 (Dep't Commerce Dec. 10, 2012) ("*Final Results*") ....................2, 4

*Ball Bearings and Parts Thereof From France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010-2011*, 77 Fed. Reg. 75973 (Dep't Commerce Dec. 26, 2012) .....................................2

*Ball Bearings and Parts Thereof From France, Germany, and Italy: Preliminary Results of Antidumping Duty Administrative Reviews and Rescission of Antidumping Duty Administrative Reviews in Part*, 77 Fed. Reg. 33159 (Dep't Commerce June 5, 2012) .....................................12

*Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping*, 75 Fed. Reg. 20335 (Dep't Commerce April 19, 2010)...............................................................................23

*Certain Oil Country Tubular Goods from the Republic of Korea: Negative Preliminary Determination of Sales at Less than Fair Value*, 79 Fed. Reg. 10480 (Dep't Commerce Feb. 25, 2014) ...........................................36

*Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 33977 (Dep't Commerce June 16, 2008)........................................................8

*Certain Steel Nails From the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 17029 (Dep't Commerce March 23, 2012) ......................................................... passim

*Certain Steel Nails from the United Arab Emirates: Final Determination of Sales at Not Less Than Fair Value*, 73 Fed. Reg. 33985 (Dep't Commerce June 16, 2008) ...............................................................8, 10

*Certain Stilbenic Optical Brightening Agents From Taiwan: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 17027 (Dep't Commerce March 23, 2012)....................................... 16, 27, 28

*Certain Stilbenic Optical Brightening Agents From Taiwan: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 76 Fed. Reg. 68154 (Dep't Commerce Nov. 3, 2011)...............................................................................29

*Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 64475 (Dep't Commerce Oct. 22, 2012).....................................................24

*Citric Acid and Certain Citrate Salts from Canada: Preliminary Results of Antidumping Duty Administrative Review; 2012–2013*, 79 Fed. Reg. 10093 (Dep't Commerce Feb. 24, 2014) ...........................................................36

*Final Determination of Sales at Less Than Fair Value: Large Residential Washers From the Republic of Korea*, 77 Fed. Reg. 75988 (Dep't Commerce Dec. 26, 2012) ...................................................................31

*High Pressure Steel Cylinders From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 26739 (Dep't Commerce May 7, 2012).........................................................27

*Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64318 (Dep't Commerce Oct. 18, 2011) .......................................................25

*Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations; Request for Comment*, 73 Fed. Reg. 26371 (Dep't Commerce May 9, 2008) ...................................................8, 10

## LEGISLATIVE HISTORY

H. Rep. No. 103-826, Part 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773 ..........35

*Statement of Administrative Action accompanying the URAA,* H.R. Doc. No. 103- 316, Vol. 1 (1994)...........................................................................35

*Uruguay Round of Multilateral Trade Negotiations, Hearing before the H. Subcommittee on Commerce, Consumer Protection, and Competitiveness*, Ser. No. 103-122, 103d. Cong., 2d Session (1994) (Written Responses of the United States Trade Representative to Chairwoman Collins) .......................36

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for plaintiff-appellant, The Timken Company, states the following:

There are no other appeals from this action in this Appellate Court or in other Appellate Courts. Fed. Cir. R. 47.5(a). Three unrelated actions are pending in the Court of International Trade that may be affected by this Court's decision in this appeal. In *Timken Co. v. United States*, Slip Op. 14-51, Consol. Ct. No. 13-00069 (Ct. Int'l Trade May 02, 2014), the Trade Court affirmed Commerce on an issue similar to the issue contested here. The action is on remand to the Department of Commerce on a different issue. In *CP Kelco Oy v. United States*, 978 F. Supp. 2d 1315 (Ct. Int'l Trade 2014), the Trade Court remanded to Commerce on an issue similar to the issue contested here. In *Mid Continent Nail Corp. v. United States*, Consol. Ct. No. 12-00133, an issue was raised similar to the issue contested here. The Trade Court issued a confidential slip opinion on June 26, 2014. The public version slip opinion has not yet been released. There are no other pending cases in this or any other court that will be directly affected by this Court's decision in this appeal. Fed. Cir. R. 47.5(b).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5).  This appeal results from a final judgment in *The Timken Company v. United States*, 968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014), JA1-16.  The judgment sustained the determination of the U.S. Department of Commerce in *Ball Bearings and Parts Thereof From France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010-2011*, 77 Fed. Reg. 73415 (Dep't Commerce Dec. 10, 2012) ("*Final Results*"), JA442-467, as amended by, *Ball Bearings and Parts Thereof From France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010-2011*, 77 Fed. Reg. 75973 (Dep't Commerce Dec. 26, 2012) ("*Amended Final Results*"), JA467.  The Trade Court's final judgment, from which this appeal was taken, was entered on February 27, 2014.  JA1-16.  Timken filed its notice of appeal on April 25, 2014, within 60 days of entry of final judgment.

## STATEMENT OF THE ISSUES

In reviews as well as investigations, at the time of these administrative reviews, Commerce applied the so-called "Nails" test to part of the U.S. sales database to determine whether targeting is occurring.  If so, Commerce considered whether to calculate dumping margins based on transaction-specific prices (instead of its default method, which relies on average price only) to unmask dumping that

would otherwise be hidden.  In the three reviews under appeal the test did reveal evidence of targeting.  Commerce, however, dismissed the evidence revealed by the Nails test as *insufficient* to consider the need for transaction-specific prices. The Court is asked to review whether that determination was lawful, given that:

- Commerce's prior decisions reasoned that once the Nails test revealed *any* evidence of patterns of significant price differences, Commerce would proceed to evaluate the need to depart from the default method by comparing the results of the default and alternative methods;

- Commerce has a duty to apply its discretionary authority in a manner that is consistent with the statutory purpose, which is to provide a remedy for dumping, including masked dumping; and

- The record already contained Commerce's own dumping calculations using both the default and alternative methods, which demonstrated the degree of masked dumping that would remain unaddressed by relying on average prices only.

# STATEMENT OF THE CASE

## Decisions below

Pursuant to Section 751 of the Tariff Act of 1930, as amended ("the Act"),

19 U.S.C. § 1675,[1] the U.S. Department of Commerce, International Trade

Administration ("Commerce" or "the Department") conducted annual reviews of

the Antidumping Duty Orders on Ball Bearings from France, Germany, and Italy,

pertaining to the 2010-11 period of review. The Department's final results were

published on December 10, 2012. JA442, *Ball Bearings and Parts Thereof From

France, Germany, and Italy: Final Results of Antidumping Duty Administrative

Reviews; 2010-2011*, 77 Fed. Reg. 73415 (Dep't Commerce Dec. 10, 2012). The

final results incorporated by reference the accompanying Issues and Decision

Memorandum ("I&D Memo"). Timken challenged the final results of

Commerce's reviews at the U.S. Court of International Trade ("CIT"), raising the

issues still in contestation here. The CIT affirmed Commerce's decision. JA1, 15,

*The Timken Co. v. United States*, 968 F. Supp. 2d 1279, 1293 (Ct. Int'l Trade

2014). The Trade Court's decision is appended.

---

[1]   The case is governed by the antidumping law as amended in 1994 by the
      Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465.
      Accordingly, citations herein are to the statute and regulations in effect from
      January 1, 1995, unless otherwise stated.

## Modifications to Commerce's methodology
## for calculating weighted average margins

A dumping margin exists when the export price is lower than the normal value. 19 U.S.C. §§ 1673 and 1677(35)(A). Commerce, in investigations, normally compares average export prices to average normal values. 19 U.S.C. § 1677f-1(d)(1)(A)(i). When needed to address the circumstances described in 19 U.S.C. § 1677f-1(d)(1)(B), however, Commerce may compare transaction export prices to average normal values. This "targeted dumping" provision permits the use of the alternative comparison methodology when:

> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) {average-to-average comparisons} or (ii) {transaction-to-transaction comparisons}.

19 U.S.C. § 1677f-1(d)(1)(B).

In the case of reviews, the statute instructs only that "when comparing export prices (or constructed export prices) of individual transactions to the weighted average price of sales of the foreign like product, the administering authority shall limit its averaging of prices to a period not exceeding the calendar

month that corresponds most closely to the calendar month of the individual export sale." 19 U.S.C. § 1677f-1(d)(2).

Prior to the modifications described below, in reviews as well as in investigations, Commerce calculated the weighted average dumping margin by summing all the dumping margins and dividing that sum by the total value of all export sales. 19 U.S.C. § 1677(35)(B). Amounts by which export prices exceeded normal values in sales that were *not* dumped were not used to offset the dumping margins calculated on dumped sales.

In 2006, to address an adverse World Trade Organization Appellate Body decision, Commerce first modified its methodology in antidumping <u>investigations</u>, by permitting offsets when relying on average export prices. *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006) ("*Final Modification in Investigations*"). When needed, however, to address the circumstances described in 19 U.S.C. § 1677f-1(d)(1)(B) (patterns of prices that differed significantly by customer, region, or time period) Commerce would depart from its default methodology and would instead rely on a comparison of transaction export prices to average normal values, without permitting offsets, to obtain a weighted average dumping margin that captured the full extent of dumping that was otherwise masked. *Id.*

In 2012, responding to later adverse WTO Appellate Body decisions, Commerce also changed its methodology in antidumping <u>reviews</u>, including antidumping annual reviews. *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8101, 8102 (Dep't Commerce Feb. 14, 2012) ("*Final Modification in Reviews*"). Commerce determined that now in reviews also, it would normally (as a "default" methodology) rely on a comparison of *average* export prices to average normal values, *albeit* limited to monthly averages as required by 19 U.S.C. § 1677f-1(d)(2), and it would normally permit offsets, as it already did in investigations. Further, in reviews too, Commerce would examine whether the circumstances described by the statute in 19 U.S.C. § 1677f-1(d)(1)(B) (patterns of prices that differed significantly by customer, region, or time period) arose, and, if so, whether there was a need to depart from the new default methodology in favor of reliance on transaction-specific prices, without offsets, to obtain a weighted average margin that reflected any dumping otherwise masked. Commerce determined that these changes would be applied, *inter alia*, in annual reviews in which preliminary results were issued after April 16, 2012. *Final Modification in Reviews*, 77 Fed. Reg. at 8101.

**The Nails test**

Following the 2006 *Final Modification in Investigations*, to facilitate the application of the changes, Commerce developed the "Nails test".[2]  The test was used to determine whether there existed among the reported U.S. sales a pattern of prices that differed significantly by customer, region, or time period.  19 U.S.C. § 1677f-1(d)(1)(B)(i).  Commerce applied the Nails test first in investigations and later, after the 2012 modifications, also in reviews.[3]

---

[2]  *See, e.g.*, *Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations; Request for Comment*, 73 Fed. Reg. 26371, 26372 (Dep't Commerce May 9, 2008) ("*Proposed Test*"); *Certain Steel Nails from the United Arab Emirates: Final Determination of Sales at Not Less Than Fair Value*, 73 Fed. Reg. 33985 (Dep't Commerce June 16, 2008) ("*Nails from the UAE I*"); *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 33977 (Dep't Commerce June 16, 2008) ("*Nails from China*").

[3]  The instant annual reviews were among the first in which Commerce applied the Nails test in the context of annual reviews.  The Nails test has been affirmed by the CIT.  *Mid Continent Nail Corporation v. United States*, 712 F. Supp. 2d 1370, 1376-79 (Ct. Int'l Trade 2010) (affirming test);  *CP Kelco Oy v. United States*, 978 F. Supp. 2d 1315, 1321-30 (Ct. Int'l Trade 2014) (affirming test, but remanding for Commerce to explain its application of its *de minimis* analysis).  *See also*, *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, Slip Op. 14-71, Ct. No. 13-00001 (Ct. Int'l Trade June 25, 2014) (recognizing that CIT has affirmed the test); *JBF RAK v. United States*, Slip Op. 14-78, Ct. No. 13-00211 (Ct. Int'l Trade July 1, 2014) (same).

Timken did not contest and is not now contesting the lawfulness of the test.[4]

It should be noted, however, that the Nails test does *not* attempt to examine *all*

---

[4]   The Nails test has been described by Commerce as follows:

> The Nails Test involves a two-step process, as described below, that determines whether the Department should considered whether the … {default} method is appropriate in a particular situation.

> In the first stage of the test, the "standard-deviation test," we determined the share of the alleged targeted group's (*i.e.*, purchaser, region or time period) sales of subject merchandise (by sales volume) that are at prices more than one standard deviation below the weighted-average price of all sales under review, targeted and non-targeted. We calculated the standard deviation on a product-specific basis (*i.e.*, by control number (CONNUM)) using the weighted-average prices for the alleged targeted group and the groups not alleged to have been targeted. If that share did not exceed 33 percent, then we did not conduct the second stage of the Nails Test. If that share exceeded 33 percent, on the other hand, then we proceeded to the second stage of the Nails Test.

> In the second stage, we examined all sales of identical merchandise (*i.e.*, by CONNUM) sold to the alleged targeted group which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales for alleged targeted group and the next higher weighted-average price of sales to the non-targeted groups exceeds the average price gap (weighted by sales volume) for the non-targeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of prices for the non-targeted groups that defined the

reported U.S. sales. To identify pricing patterns under the Nails test, Commerce compares prices in sales of identical products only. "All price comparisons would be done on the basis of identical merchandise." *Proposed Test*, 73 Fed. Reg. at 26372. Thus, if a product is sold only to one customer, or region, or in only one time period, Commerce ignores the sale—Commerce does not compare that sale to the sale price of a similar (still comparable) product.[5] While the Department's approach may be justified, it necessarily means that the agency examines only a

---

(footnote continued from previous page)

> price gap. In doing this analysis, the alleged targeted group's sales were not included in the non-targeted groups; the alleged targeted group's average price was compared only to the average prices for the non-targeted groups. If the share of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the alleged targeted group, then we determined that targeting occurred.

JA456-457, *I&D Memo*, pages 12-13 (bracketed material added).

[5] Indeed, when a petitioner argued that the test should be expanded to also compare prices of similar products "in order to maintain as large a sales database as possible", Commerce rejected the argument:

> For purposes of these final determinations, the Department continues to base its targeted dumping analysis on price comparisons between identical products (identified by CONNUMS). The statute and regulations do not require an analysis of all of the respondent's sales for a targeted dumping determination.

*Nails from the UAE I*, 77 Fed. Reg. 33985, I&D Memorandum, page 18.

subset of U.S. sales and draws its conclusions from the existence of pricing

patterns on that subset only.

## Preliminary Results

The proceedings at issue are the administrative reviews of the antidumping

duty orders on ball bearings from France, Germany, and Italy for the 2010-2011

period of review.  Prior to the preliminary results, Timken provided its analysis of

U.S. sales using the Nails test, and requested that Commerce should do likewise

and should modify its calculation of weighted average dumping margins

accordingly.  JA1050-1054 (NTN-France), JA2000-2004 (myonic-Germany),

2150-2154 (Schaeffler-Italy), 2200-2204 (SKF-Italy) (Timken's targeting

allegations).

In the preliminary results, however, Commerce simply relied on the

comparison and margin calculation methods adopted as the new default methods in

*Final Modification in Review,*[6]  77 Fed. Reg. at 8102.  Thus, Commerce used

---

[6]   The preliminary results in the subject annual reviews were initially due on
January 31, 2012, prior to the April 16, 2012, effective date of the *Final
Modification in Reviews*.  Commerce, however, twice extended.  JA1000, 77
Fed. Reg. 2511 (Dep't Commerce Jan. 18, 2012) (extending to April 2, 2012);
JA2320-2321, 77 Fed. Reg. 16537, 16538 (Dep't Commerce March 21, 2012)
(extending to May 30, 2012).  Preliminary results issued on May 30, 2012,
rendering the modifications applicable.  JA3400-3401, *Ball Bearings and Parts
Thereof From France, Germany, and Italy: Preliminary Results of Antidumping*

monthly average export prices, comparing those to monthly average normal values, and permitted the results of those average-to-average comparisons that revealed no dumping margin to offset the results of comparisons that did show margins.  On the basis of the default method, Commerce calculated zero margins for all respondents examined.  JA3405-3406, *Preliminary Results*, 77 Fed. Reg. at 33164-65.

In its preliminary results, Commerce acknowledged that targeting allegations had been filed, but asserted it had not had sufficient time to reach a determination with respect to these allegations.  JA3200-3201, Prelim. Analysis Memorandum for SKF-Italy, pages 1-2.  In its case briefs, Timken continued to argue that Commerce should depart from the default method and should compare individual (rather than average) export prices with monthly average normal values, and should disallow offsets.  JA3454-3461 (France, pages 2-9); JA3484-3491 (Germany, pages 2-9); JA3507-3515 (Italy, pages 3-11) (Timken case briefs).

---

(footnote continued from previous page)

*Duty Administrative Reviews and Rescission of Antidumping Duty Administrative Reviews in Part*, 77 Fed. Reg. 33159, 33160 (Dep't Commerce June 5, 2012) ("*Preliminary Results*").

**Applying the Nails Test**

Commerce subsequently addressed the allegations, and itself applied the

Nails test in revised calculations released *after* the issuance of the preliminary

results.  JA3600-3605.

As applied by Commerce in these calculations, the Nails test revealed

evidence of patterns of price differences that differed significantly.  19 U.S.C. §

1677f-1(d)(1)(B)(i).   Commerce, however, determined that the evidence revealed

by the test was insufficient to consider the need for alternative methodologies.[7]  19

U.S.C. § 1677f-1(d)(1)(B)(ii).

---

[7]   As the CIT recognized, Commerce's explanations were not consistent: "The
court notes that Commerce's inconsistency in its explanations has generated
quite a bit of confusion that is reflected in the briefing of this case."  JA9, 968
F. Supp. 2d at 1287.  On the one hand, Commerce explained that it did not find
a pattern:  "We continue to find, for each respondent, that a pattern of export
prices (or constructed export prices) for comparable merchandise that differ
significantly among purchasers, regions, or time periods does not exist . . .".  *Id,*
quoting Commerce's explanations on the record. Elsewhere, however,
Commerce asserted a pattern was found, but that the pattern was insufficient to
proceed with additional inquiry: "The Department preliminarily finds, for each
respondent, that the pattern of export prices (or constructed export prices) for
comparable merchandise that differ significantly among purchasers, regions, or
time periods is insufficient to consider whether the standard comparison method
can account for the alleged targeted dumping."  *Id.*  Commerce, however,
unequivocally adopted the latter position in briefing to the Trade Court and at
argument.  "The government clarified at oral argument and in its supplemental
briefing that the Nails test finds the requisite pattern and that Commerce's
sufficiency determination was made pursuant to its discretionary authority

This "sufficiency" determination was made separately and subsequent to the application of the Nails test, and was based on a simple ratio. The denominator of the ratio consisted of the volume and value of *all* U.S. sales of subject product by that respondent. The numerator of the ratio consisted of the total volume and value of sales that were identified by the Nails test as indicating a pattern of significant price differences.[8] The results were as follows:

| PUBLIC VERSION -- BPI in Brackets Redacted | | | | |
|---|---|---|---|---|
| Sales indicative of a Pattern, as a Percentage of All Export Sales of Subject Product | | | | |
| | | **By value** | **By volume** | |
| **France** | NTN-SNR | [ ** | ** | ] |
| **Germany** | Myonic | [ ** | ** | ] |
| **Italy** | Schaeffler | [ ** | ** | ] |
| | SKF | [ ** | ** | ] |
| *Sources*: JA3621, Commerce Post-Prelim. Analysis for NTN-SNR (10/16/12), page 2; JA3851, Commerce Post-Prelim. Analysis for myonic (10/16/12), page 2; JA4251, Commerce Post-Prelim. Analysis for Schaeffler (10/16/12), page 2; and JA4401, Commerce Post-Prelim. Analysis for SKF (10/16/12), page 2. In the case of SKF, calculations [ ************* ******************************************************* ] JA6883-6884, Commerce Final Analysis for SKF (12/4/12), Attachment: margin calculation program and output, output pgs. 99-100. | | | | |

---

(footnote continued from previous page)

granted by the word "may" in § 1677f-1(d)(1)(B)." *Id.*

[8] As already reviewed, however, and as recognized by Commerce, the Nails test does not examine all U.S. sales.

Relying solely on this ratio, Commerce found that for each respondent, the volume and value of sales identified by the test indicated targeting was too small in comparison with the respondent's total export sales of subject product, and declined to consider whether to abandon reliance on the default method.[9]

The materials included in Commerce's calculations, as disclosed to interested parties, however, also included alternative dumping calculations, using both the default and the alternative comparison methods, as follows:

| PUBLIC VERSION – BPI in Brackets Redacted | | | |
|---|---|---|---|
| | | w. av. margins obtained using transaction-specific U.S. prices without offsets (alternate method) | w.av. margins obtained using average U.S. prices only, with offsets (default method) |
| **France** | NTN-SNR | [**] Percent | 0 Percent |
| **Germany** | Myonic | [**] Percent | 0 Percent |
| **Italy** | Schaeffler | [**] Percent | 0 Percent |
| | SKF | [**] Percent | 0 Percent |

*Sources*: JA3836, Commerce Post-Prelim. Analysis for NTN-SNR (10/16/12), Attachment D: margin calculation log and output, page 175; JA3890, Commerce Post-Prelim. Analysis for myonic (10/16/12), Attachment D: margin calculation log and output, page 94; JA4298, Commerce Post-Prelim. Analysis for Schaeffler (10/16/12), Attachment E: margin calculation log and output, page 74; JA4733, Commerce Post-Prelim. Analysis for SKF (10/16/12), Attachment E: margin calculation log and output, page 124. [ *********************************************** *********] JA6887, Commerce Final Analysis for SKF (12/4/12), page 119.

---

[9]  JA3621 (NTN); JA3851 (myonic); JA4251 (Schaeffler); JA4401 (SKF) (post-preliminary analysis memoranda).

**Timken's arguments before the agency**

In written comments regarding the post-preliminary results and at a hearing conducted by Commerce, Timken protested Commerce's new calculations. Timken argued, *inter alia*, that Commerce had previously expressly rejected the application of any *de minimis* type of analysis over and above the Nails test, and had provided reasoning in support of those decisions. JA4970-4972 (Timken comments, France, pages 7-9) and JA6059-6062, 6064 (Italy hearing, pages 10-13 and 15).[10] Timken argued that in accordance with Commerce's prior decisions, if the Nails test showed any evidence of patterns of significant price differences, Commerce should then evaluate whether the default method could account for the patterns by comparing the results obtained with the default method (average export prices, offsets) with the results obtained with the alternate method (transaction export prices, no offsets), without applying any additional threshold after the Nails test had already identified evidence of patterns of significant price differences.

---

[10] Timken acknowledged that at that time, in one investigation (*Stilbenic Optical Brightening Agents from Taiwan*), Commerce did apply such a *de minimis* supplemental test, although the issue appeared uncontested, and Commerce did not explain the apparent departure. *See, e.g.*, JA5175-5176, Timken rebuttal brief (France), Nov. 7, 2012, pages 13-14 and JA622-662, Timken Factual Information Submission, Nov. 17, 2011, Public Exhibit 5 (attaching the preliminary results of the OBA investigation, applying a supplemental *de minimis* test).

JA4968-4970 (Timken comments, France, pages 5-7) and JA6064-6066 (Italy hearing, pages 15-17). Timken also noted that in these reviews "Commerce has already examined whether the standard and alternate method produce different results." JA4976-4977 (Timken comments, France). *Accord*, JA5015-5016 (Germany) and JA5076-5077 (Italy).

## Final results

On December 4, 2012, Commerce issued its final results.[11] Commerce did not change the post-preliminary calculations. JA447-460, *Final Results*, Issues and Decision Memorandum, pages 3-16 (discussing arguments).[12] In response to Timken's arguments, Commerce asserted that the statute allowed discretion, permitting the agency to decline to use the alternative method, even when the statutory criteria were satisfied: "section 777A(d)(1)(B) of the Act states that the Department 'may' determine whether to use the A-T method to calculate the weighted-average dumping margin if the two criteria, (i) and (ii), are satisfied." JA458 (*Final Results*, I&D Memo, page 14).

---

[11] Published on December 10, 2012. 77 Fed. Reg. 73415. *See also* JA442; and Commerce's website. http://ia.ita.doc.gov/frn/2012/1212frn/2012-29770.txt.

[12] The Issues and Decision Memorandum, referred to in the Federal Register notice, is available on Commerce's website. http://ia.ita.doc.gov/frn/summary/MULTIPLE/2012-29770-1.pdf. *See also* JA445.

With regard to its prior decisions, Commerce argued that the facts in the instant reviews were different from the investigation decisions relied upon by Timken.  JA458-459 (*Final Results*, I&D Memo, pages 14-15).   Commerce added that, in any event, in the *Taiwan SBA* investigation*,* the agency had likewise declined to apply the alternate method based on insufficient sales being identified by the test.   JA457 (*Final Results*, I&D Memo, page 13).   The agency also disagreed with Timken's assertion that the application of a sufficiency test was even more inappropriate in reviews than in investigations.  JA458 (*Final Results*, I&D Memo, page 14).  The agency explained that in reviews as in investigations, it would deviate from the default method "where the facts warrant".   *Id.*

## Decision of the Trade Court

Before the CIT, Timken argued, *inter alia*, that Commerce's decision departed from prior reasoning and that Commerce had not adequately explained this departure.  Timken further argued that the sufficiency test, as it had been applied by Commerce, in effect amounted to a "de minimis" test, and that, under governing precedent, Commerce had a duty to explain why the evidence revealed could be ignored and how its decision would account for any masked dumping. The Trade Court, however, affirmed the decision of Commerce, ruling that Commerce's sufficiency determination was grounded in the agency's discretionary authority.   JA9-10, 968 F. Supp. 2d at 1287-88, *citing* 19 U.S.C. § 1677f-

1(d)(1)(B). The Trade Court also rejected the argument that Commerce's decision was contrary to prior agency decisions.

## SUMMARY OF THE ARGUMENT

In these reviews, Commerce determined that the volume and value of sales identified by the Nails test's examination of identical sales as indicative of targeting was too small in comparison with total export sales to warrant consideration of the alternative comparison.

Commerce's decision, however, constituted a radical and unexplained departure from several prior decisions, wherein Commerce rejected proposals to subject the results of the Nails test to an additional *de minimis* or sufficiency test. In these prior decisions, Commerce reasoned that once the Nails test revealed any evidence of patterns of prices that differed significantly, then Commerce would evaluate the need for the alternative comparison method by comparing the results obtained with the default and the alternative methods. In these prior decisions, Commerce also reasoned that the volume and value of sales of identified by the Nails test as indicative of targeting was likely always small. Commerce has not explained why these prior reasonings are no longer valid, or why they do not apply in these reviews. *Infra*, Section II, starting on page 21.

In addition, Commerce's decision constituted an abuse of its discretion. Commerce has claimed that it has *discretion* under the statute to either continue to rely on its default methodology, which relies on average U.S. prices only, or to switch to its alternate methodology, which examines transaction prices. Such discretion, however, is not unfettered, and has to be exercised in a manner that serves the purpose of the law. Here, the record already contained Commerce's own dumping calculations using both the default and alternative methods. When Commerce calculated the dumping margins using the alternate comparison method, dumping margins ranged [*************************]. These data demonstrated directly the degree of masked dumping that would remain unaddressed by relying on average prices only. The exercise of discretion in a manner not consistent with the purpose of the statutory provision involved constitutes an abuse of discretion by the agency. *Infra*, Section III, starting on page 33.

## ARGUMENT

### I.     Standard of Review

This Court applies the same standard as the Court of International Trade, reviewing Commerce's antidumping determinations for substantial evidence on the record, and errors of law. *NTN Bearing Corp. v. United States*, 368 F.3d 1369, 1372 (Fed. Cir. 2004). Thus, the Court will reverse any determination that is found

to be unsupported by substantial evidence or otherwise not in accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court applies the statute's standard of review to Commerce's determination.  *Committee for Fairly Traded Venezuelan Cement v. United States*, 372 F.3d 1284, 1288 (Fed. Cir. 2004); *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002).  The Court does the same when reviewing agency decisions on matters where the statute permitted discretion.  *Freeport Minerals Company v. United States*, 776 F.2d 1029, 1032 (Fed. Cir. 1985).

## II.      The agency departed from prior decisions without adequate explanation.

### A.      Agencies must explain departures from previous norms

While it is well-settled that an agency has the discretion to modify its practice, it is equally well-settled that when an agency does depart from prior norms or policies, it must provide an adequate justification for such departures.  *See, e.g.*, *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) ("When an agency changes its practice, it is obligated to provide an adequate explanation for the change." (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983))).  As the Supreme Court has explained:

> The agency may flatly repudiate those norms, deciding,
> for example, that changed circumstances mean that they

> are no longer required in order to effectuate
> congressional policy. Or it may narrow the zone in which
> some rule will be applied, because it appears that a more
> discriminating invocation of the rule will best serve
> congressional policy. Or it may find that, although the
> rule in general serves useful purposes, peculiarities of the
> case before it suggest that the rule not be applied in that
> case. Whatever the ground for the departure from prior
> norms, however, it must be clearly set forth so that the
> reviewing court may understand the basis of the agency's
> action and so may judge the consistency of that action
> with the agency's mandate.

*Atchison, Topeka & SFR Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973).

*Accord*, *Humane Society of the United States v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) (duty to explain a "seemingly inconsistent approach" between decisions); *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1326-29 (Fed. Cir. 2009) (Commerce's sunset decision, without explanation, departed from prior focus on pre-order import volumes); *Micron Technology, Inc. v. United States*, 19 CIT 829, 834-35, 893 F. Supp. 21, 29 (1995), *aff'd*, 117 F.3d 1386 (Fed. Cir. 1997) (no attempt to distinguish two prior cases when endorsing opposite approach). This Court has similarly recognized that regardless of whether an agency changes its policy based on "a change of circumstance or a changed view of the public interests," it must provide a "reasoned analysis" for the change in course. *Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1379 (Fed. Cir. 2004) (quoting *State Farm*, 463 U.S. at 57).

22

B. **In several decisions, Commerce determined that the results of the Nails test should *not* be set aside based on a comparison of the volume and value of sales identified by the test with the total export sales of the respondent, and supplied detailed reasoning in support of those decisions.**

Commerce recognized early on that once the Nails test revealed evidence of

the pattern of price differences described in the statute, then the significance of that

evidence was best evaluated by directly comparing the margins calculated using

transaction prices without offsets with the margins calculated under the default

method, as such a comparison would reveal any masked dumping.  For example:

> If the share of the sales that meets this {gap} test exceeds
> 5 percent of the total sales volume of subject
> merchandise to the alleged targeted customer, the
> significant-difference requirement is met and the
> Department determines that customer targeting has
> occured {sic}.  In such a case, in accordance with
> *Carrier Bags/Taiwan* and *Carrier Bags/Indonesia*, the
> Department will evaluate the extent to which applying
> the alternative average-to-transaction methodology to all
> U.S. sales unmasks targeted dumping not accounted for
> using the standard average-to-average comparison
> methodology.

*Certain Oil Country Tubular Goods from the People's Republic of China: Final*

*Determination of Sales at Less Than Fair Value, Affirmative Final Determination*

*of Critical Circumstances and Final Determination of Targeted Dumping*, 75 Fed.

Reg. 20335 (Dep't Commerce April 19, 2010), I&D Memorandum, pages 8-9.

Similarly, more recently:  "The Department's recent practice is to utilize the

targeted dumping test in *Nails*, as modified in *Wood Flooring*, to identify targeted dumping and, if targeted dumping is determined to exist, then the Department determines whether the standard comparison methodology can account for the identified targeted dumping." *Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 64475 (Dep't Commerce Oct. 22, 2012), I&D Memorandum, page 48 (emphasis added). In other words, Commerce had an established practice of comparing the results of the default and alternative methodologies in any situation in which the two steps of the Nails test were met.

In keeping with this practice, when parties in other investigations proposed that Commerce should set aside the results of the test because the sales identified by the Nails test were small in volume and value compared to the respondent's overall export sales, the agency rejected the argument, using the same reasoning: the significance of the evidence revealed by the test was best evaluated by comparing the results of the margin calculations, not through an additional sufficiency test. As explained by Commerce:

> {O}nce the Department finds any instances of targeted dumping, the Department has determined that application of the average-to-transaction methodology is necessary to fully analyze the extent of the dumping that is taking place.

24

*Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64318 (Dep't Commerce Oct. 18, 2011) ("*Wood Flooring from China*"), I&D Memorandum, page 32.

Commerce expanded on this reasoning in additional decisions rejecting a separate sufficiency test, noting, among other things, that the Nails test itself was *inherently* unlikely to identify a large volume of sales as targeted.   In *Certain Steel Nails From the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 17029 (Dep't Commerce March 23, 2012) ("*Nails from the UAE II*"), the respondents argued that the pattern requirement could not be satisfied unless there existed a "meaningful number of targeted sales" and that the "inconsequential" quantities of sales found to be targeted relative to overall sales did not constitute a pattern. *Nails from the UAE II*, I&D Memorandum, pages 13-14.  Citing *Wood Flooring from China*, the petitioner in *Nails from the UAE II* disagreed, and noted that once the demanding thresholds of the test are met, a pattern is established (even if the transactions identified by the test represent only a small portion of overall sales) and Commerce must examine what the margins would be if calculated using transaction prices without offsets. *Nails from the UAE II*, I&D Memorandum, page 14.

Commerce agreed with the petitioners and rejected the argument in support of a *de minimis* standard:

> In calculating margins, pursuant to section 777A(d)(1)(B)(i) of the Act the Department may use the A-T comparison methodology if "there is a pattern of export prices…for comparable merchandise that differ significantly among purchasers, regions, or periods of time." This statutory language does not establish how a pattern of prices should be measured in terms of the prevalence of underlying sales in relation to all sales. Instead, the statute states that there must be a variance in export prices among purchasers, regions, or periods of time, and that the variance must exhibit a pattern. Thus, the **task of finding a pattern involves determining the frequency of low prices in a given group of sales, and not whether the sales in that group were frequent in relation to all sales.**

*Nails from the UAE II*, I&D Memorandum, pages 14-15 (emphasis added).

Commerce also noted that the respondents had not demonstrated why a small percentage of overall sales could not exhibit a pattern, recognizing that "the targeted sales are not likely to account for a significant portion of sales because, by definition, targeting is an act of selectively pursuing a specific market segment or product." *Id.*, page 15. In other words, a comparison of the volume and value of sales identified by the test with total export sales is not particularly instructive. This is especially so considering that the numerator (sales identified by the test) only reflects the sales actually examined by the test, which is limited to sales of involving identical merchandise. *Supra*, Statement of the Case, page 10.

Commerce decided similarly again in *High Pressure Steel Cylinders From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 26739 (Dep't Commerce May 7, 2012) ("*Steel Cylinders from China*"). Respondent BTIC argued, *inter alia*, that Commerce should adopt a *de minimis* rule. *Steel Cylinders from China*, I&D Memorandum at 24. Commerce rejected this argument in a detailed analysis, bearing the caption "De Minimis Standard in the Targeted Dumping Test". *Id.*, page 31.[13]

C.  Commerce's explanation did not address these prior decisions or their reasoning in any meaningful way.

Commerce, at JA457-459, I&D Memorandum, pages 13-15, explained that its decision was consistent with Commerce's decision in *Certain Stilbenic Optical Brightening Agents From Taiwan: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 17027, 17027-28 (Dep't Commerce March 23, 2012) ("*Taiwan SBAs, final*"); that the facts in the decisions relied on by Timken, including *Nails from the UAE II*, were different from the facts in the instant reviews; that the statute allows Commerce discretion, and that the *Final*

---

[13] *Wood Flooring from China, Nails from the UAE II*, and *Steel Cylinders from China* were fully briefed to the agency in Timken's November 2012 comments, filed in response to Commerce's post-preliminary results calculations and rejection of the results of the Nails test. JA4970-4976 (France), JA5009-5015 (Germany), JA5070-5076 (Italy).

*Modification for Reviews* explained that Commerce would proceed on a case by

case basis.  In the words of Commerce:

> We acknowledge that our decision in *Taiwan SBA*s
> differs from our decisions in other proceedings, but that
> is because the facts of the various cases were different.
> For example, Timken cites to *UAE Nails* for its
> proposition that the Department has specifically rejected
> the application of an additional *de minimis* requirement;
> while we cannot specify the data we examined in *UAE
> Nails* in the context of these reviews because that data is
> business proprietary data from another proceeding, we
> can state that the facts of *UAE Nails* are significantly
> different from the fact patterns we observed in these
> reviews.

*Final Results*, I&D Memorandum, pages 14-15.

Commerce's decision in *Taiwan SBAs*, however, contains no explanations

addressing the contrary reasonings in other cases either, and so, any "consistency"

of the decisions under appeal here with *Taiwan SBAs*, without added explanation,

does not provide support for Commerce's determination.  *Taiwan SBAs, Final*, 77

Fed. Reg. at 17027 (stating decision that test identified insufficient sales as a

proportion of the respondent's total U.S. sales) and 17029 (issue not addressed in

I&D Memorandum).[14]

---

[14]   *Accord*, *Certain Stilbenic Optical Brightening Agents From Taiwan:
Preliminary Determination of Sales at Less Than Fair Value and Postponement
of Final Determination*, 76 Fed. Reg. 68154, 68156 (Dep't Commerce Nov. 3,

Further, the agency's assertion that the facts in *Nails from the UAE II* are "significantly different from the fact patterns we observed in these reviews" is unsupported. Different facts, however, are not enough: the agency must still explain its policies and reasoning, so that the reviewing court may determine the relevance of claimed factual distinctions. *Atchison*, 412 U.S. at 808-09. As the Trade Court observed in a different case, the fact that "the administrative agency may make varying decisions based on the facts of particular cases does not permit the agency to act arbitrarily. In order to ascertain whether action is arbitrary, or otherwise not in accordance with law, reasons for the choices made among various potentially acceptable alternatives usually need to be explained." *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988).

Nor does the fact that Commerce has discretion obviate the requirement that it must explain departures from practice. *See Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004) ("Despite Commerce's statutory discretion, SDO correctly points out that if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable

(footnote continued from previous page)

2011) ("*Taiwan SBAs, Prelim.*") (test identified insufficient sales when measures as a proportion of the respondent's total U.S. sales).

explanation as to why it departs therefrom."). *See also, infra*, section III, starting

on page 33, reviewing that Commerce abused its discretion.

> D. <u>The Trade Court's reasoning that Commerce's contrary decisions are not relevant because they only address the pattern determination elevates form over substance and was, in any event, not adopted by the agency.</u>

The Trade Court dismissed the relevance of Commerce's prior decisions, on

the grounds that these cases addressed the task of finding a pattern, not whether

that pattern was sufficient. For example, with respect to *Nails from the UAE II* the

Trade Court reasoned that the language relied on by Timken dealt with the

statutory definition of pattern only. In contrast, the Court reasoned, Commerce

found a pattern in the instant reviews, but determined that the pattern was not

sufficient to warrant consideration of the alternate method. JA10, 968 F. Supp. 2d.

at 1288.

This distinction, however, elevates form over substance. First, as the Trade

Court itself observed, Commerce's own explanations were inconsistent on the

issue of whether a pattern was found, and the agency appeared to settle on a single

explanation only on appeal. *Supra*, Statement of the Case, page 13, fn. 7. Further,

regardless of Commerce's or the Trade Court's formulations, the substance of the

issue was clearly described in Commerce's decisions, and was *identical* to the

issue presented in these reviews: whether Commerce should set aside the results of

the test because the test identifies a number of sales that is small in total volume and value when compared with the total volume and value of the exporter's overall export sales of subject products to the United States.  In one of the earlier cases, Commerce noted, for example, that "Dubai Wire and Precision argue that with respect to the customer targeted dumping allegation, the Department found an insignificant number of targeted sales to certain customers in relation to all sales made by each company, respectively." *Nails from the UAE II*, I&D Memorandum, page 14.  In another case: "LG argues that this could be accomplished by increasing the number of standard deviations in the standard-deviation test from one to two, or by applying a de minimis threshold under which targeting must be found in excess of a certain percentage of the U.S. sales database." *Final Determination of Sales at Less Than Fair Value: Large Residential Washers From the Republic of Korea*, 77 Fed. Reg. 75988 (Dep't Commerce Dec. 26, 2012) ("*Washers from Korea*"), I&D Memorandum, page 17.

Moreover, the argument that the prior Commerce decisions are not relevant because they address the pattern requirement (and here Commerce found a pattern but then found that the evidence was nevertheless not sufficient) is an argument advanced by the Trade Court only—Commerce explained only that factual differences between the instant reviews and the cited decisions led to different determinations: "We acknowledge that our decision in Taiwan SBAs differs from

31

our decisions in other proceedings, but that is because the facts of the various cases were different." JA458, I&D Memorandum, page 14. A determination of an administrative agency, however, can no more be affirmed on the basis of the explanations created by the reviewing court than it can on the basis of the explanations of counsel—an agency's determination must stand or fall on its own explanations. "{The} district court may not create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from Commissioner's decision itself." *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005). *See also*, *Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962); *Ad Hoc Committee v. United States*, 13 F.3d 398, 401, n.8 (Fed. Cir. 1994).

In sum, as Commerce had an established practice with respect to its targeted dumping analysis and departed from that practice without sufficient explanation, Commerce's determination was not in accordance with law.

III.    **The agency's decision that the evidence revealed by the Nails test was insufficient to warrant consideration of alternative calculation methods constituted an abuse of its discretion.**

A.    The agency's discretion is not unfettered; it is bounded by the purpose of the law, which, in this instance, was to address masked dumping.

The Trade Court reviewed that Commerce's decision to set aside the results of the test as "relatively insignificant" simply reflected the discretion afforded by the statute.  JA12-13, 968 F. Supp. 2d at 1290-91.  Commerce's explanation also focuses on the discretion afforded by the statute, and notes that the agency proceeds on a case by case basis, departing from the default method only "where the facts warrant".  JA458, I&D Memorandum, pages 14.

The agency's discretion, however, is not unbounded: "{T}he grant of discretionary authority to an agency implies that the exercise of discretion be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." *Freeport Minerals Company v. United States*, 776 F.2d 1029, 1032 (Fed. Cir. 1985) (agency decision to revoke without having obtained recent sales data held to be an abuse of discretion).[15]  *Accord,  F. Lli De Cecco Di Filippo Fara S. Martino v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)

---

[15]  The Court reviewed that the statute in issue provided that the administering authority "may revoke, in whole or in part, a countervailing duty order or an antidumping duty order."  776 F.3d at 1031.

(agency discretion in selecting facts available rates is not unbounded, and reviewing Congressional intent). Moreover, even discretionary decisions have to find support in the record. 216 F.3d at 1032-33 (reviewing whether selection was corroborated by the record). *Accord, Gallant Ocean (Thailand) v. United States*, 602 F.3d 1319 (Fed. Cir. 2010).

Here, the intent of the statute is clear: Commerce's selection of comparison methods should account for targeted or masked dumping, and the alternative comparison method was included in the statute to ensure the agency's ability to do so. [16] The Statement of Administrative Action accompanying the 1994 modifications describes the concern:

> In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal "targeted dumping." In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.

*Statement of Administrative Action accompanying the URAA,* H.R. Doc. No. 103-316, Vol. 1, at 842 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177-78

---

[16] The courts, of course, have affirmed agency methodologies to address masked dumping. *Timken Co. v. United States*, 354 F.3d 1334, 1342-43 (Fed. Cir. 2004); *Serampore Industries Pvt., Ltd. v. United States*, 11 CIT 866, 873-74, 675 F. Supp. 1354, 1360-61 (1987).

("SAA"). And the SAA makes clear that new provision 19 U.S.C. § 1677f-

1(d)(1)(B) is intended to answer the concern:

> New section 777A(d)(1)(B) provides for a comparison of
> average normal values to individual export prices or
> constructed export prices in situations where an average-
> to-average or transaction-to-transaction methodology
> cannot account for a pattern of prices that differ
> significantly among purchasers, regions, or time periods,
> i.e., where targeted dumping may be occurring.

*Id.* at 843.[17] *See also*, H. Rep. No. 103-826, Part 1, at 99 (1994), *reprinted in* 1994

U.S.C.C.A.N. 3773, 3771 (same).

The statute's use of the verb "may" does *not* signify that the agency is free to

ignore targeting and masked dumping. Instead, it merely recognizes that there are

---

[17] The new subsection reflected provisions in the Uruguay Round Antidumping
Agreement to respond to U.S. concerns that dumping would be masked if
weighted average export prices were compared to weighted average normal
values. *See* Terence P. Stewart, *Introduction and Overview, in 1 The GATT
Uruguay Round: A Negotiating History* (1986-1992) 96 (Terence P. Stewart
ed., Kluwer Law & Taxation Publishers 1993). Thus, in Article 2.4.2 of the
Agreement: "A normal value established on a weighted average basis may be
compared to prices of individual export transactions if the authorities find a
pattern of export prices which differ significantly among different purchasers,
regions or time periods, and if an explanation is provided as to why such
differences cannot be taken into account appropriately by the use of a weighted
average-to-weighted average or transaction-to-transaction comparison."
Agreement on Implementation of Article VI of the General Agreement on
Tariffs and Trade 1994 (Apr. 15, 1994), *reprinted in* World Trade Organization,
The Legal Texts: The Results of the Uruguay Round of Multilateral Trade
Negotiations 147 (1999).

instances where the alternative and default methods do not result in margins that differ meaningfully, and that Commerce can continue to apply its default methods when that is the case.[18]

> B. The record included Commerce's own alternative margin calculations, which demonstrated the extent of masked dumping.

Here, Commerce used its discretion to determine that the volume and value of sales identified in the test as indicative of a pattern of significant price differences was *insufficient* to warrant consideration of alternative methodologies. The materials submitted by Commerce, however, in the context of its post-preliminary calculations, already included margin calculations reflecting

---

[18] Thus, Commerce, in recent determinations, has explained: "A difference in the weighted-average dumping margins is considered meaningful if: 1) there is a 25 percent relative change in the weighted-average dumping margin between the A-to-A method and the appropriate alternative method where both rates are above the de minimis threshold, or 2) the resulting weighted average dumping margin moves across the de minimis threshold." *Certain Oil Country Tubular Goods from the Republic of Korea: Negative Preliminary Determination of Sales at Less than Fair Value*, 79 Fed. Reg. 10480 (Dep't Commerce Feb. 25, 2014), I&D Memorandum, page 18 (margins do not exceed *de minimis* with either method, so default method is used); *Citric Acid and Certain Citrate Salts from Canada: Preliminary Results of Antidumping Duty Administrative Review; 2012–2013*, 79 Fed. Reg. 10093 (Dep't Commerce Feb. 24, 2014), I&D Memorandum, page 6 (alternate comparison methodology moves margin across *de minimis* threshold, so alternate method is used ). *See Uruguay Round of Multilateral Trade Negotiations, Hearing before the H. Subcommittee on Commerce, Consumer Protection, and Competitiveness*, Ser. No. 103-122, 103d. Cong., 2d Session, page 68 (1994) (Written Responses of the United States Trade Representative to Chairwoman Collins).

transaction-specific comparisons (the alternative method), and weighted average margins without offsets.  As the Supreme Court has held, an agency must address all important aspects of the issue decided.  *State Farm*, 463 U.S. 29, 43,[19]  quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285 (1974) and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).   Given the express statutory purpose of addressing masked dumping, and Commerce's failure to address its own calculation demonstrating that transaction specific comparisons showed [*********************], Commerce's decision to continue to rely on average comparisons is an abuse of its discretion, and is unsupported by the record.

---

[19]  The United States Department of Transportation issued a rule that required manufacturers of automobiles to install "passive restraints" (either airbags or automatic belts).  The rule, however, was later rescinded.  In support of the rescission, the agency explained that manufacturers had overwhelmingly selected to install automatic belts (rather than airbags), and that automatic belts had been shown to be easy to detach, and, in such a case, did not present a safety advantage.  The Court found this decision unlawful because the agency's explanation did not address important aspects of the problem.  The agency had not explained why, if automatic belts had proven ineffective, it could not have required the installation of airbags.  Also, the agency had not addressed the "inertia factor".  As the Court explained, manual belts require the active decision of the user to buckle up, automatic belts do not; and the safety benefit of the automatic belt is nullified only upon the active decision of the user to detach the belt from the vehicle.

C.  <u>Commerce may set aside evidence as *de minimis*, but such decisions must be adequately explained and must be supported in the record.</u>

Commerce's decision also contravenes this Court's instruction to justify decisions to reject calculation results as *de minimis*. Timken recognizes that Commerce has asserted that it has not imposed a *de minimis* standard. *See* Defendant's Response to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, Sept. 20, 2013, at 12-15.[20] Commerce, however, has provided no reasoning for setting aside the results of the Nails test other than that the amount of sales passing the test was too small. Thus, Commerce has imposed a *de minimis* standard in fact, if not in name.

Generally, of course, the application of the doctrine that "*de minimis non curat lex*" has been affirmed in the context of the application of the trade laws. *See, e.g.*, *Alcan Aluminum Corp. v. United States*, 165 F.3d 898, 899-906 (Fed. Cir. 1999) (refusal of Customs to apply the principle in context of substantial transformation held unreasonable); *Carlisle Tire & Rubber Co. v. United States*, 1 CIT 352, 353, 517 F. Supp. 704, 706 (1981) (*de minimis* doctrine held to apply to countervailing duty cases). The application of the doctrine, however, must be justified. Thus, in *Carlisle Tire & Rubber Co. v. United States*, 10 CIT 301, 306,

---

[20] U.S. Court of International Trade, Cons. Ct. No. 12-00415, ECF No. 59.

634 F. Supp. 419, 424 (1986), the Trade Court held that Commerce had to support why a 0.45 percent was *de minimis* "in this investigation{,}" and recognized that "{s}mall margins may be important."[21]  *Id.*  And, in *Washington Red Raspberry Comm'n v. United States*, 859 F.2d 898, 903 (Fed. Cir. 1988), this Court reviewed Commerce's decision that a dumping margin of 0.42 percent was *de minimis*. Adopting as its own the holding of the Trade Court in *Carlisle*, the appellate court held that "the ITA may find that dumping margins less than 0.50 percent are *de minimis*, but only if the ITA explains the basis for its decision."  859 F.3d at 903. As the Court explained, Commerce's determination would be affirmed if "we determine both that the record contains substantial evidence supporting the ITA's calculation of the dumping margin and that the record contains substantial evidence supporting the ITA's basis for its application of the *de minim{i}s* rule." *Id.*[22]

------

[21]  The agency acknowledged that *Carlisle* required Commerce either to publish a rule subject to notice and comment procedures, or to explain the basis for its *de minimis* decision in each determination.  As a result, the agency published a rule.  *Antidumping and Countervailing Duties; De Minimis Dumping Margins and De Minimis Subsidies*, 52 Fed. Reg. 30660 (Dep't Commerce Aug. 17, 1987), citing *Carlisle*.

[22]  Ultimately, the appellate court affirmed Commerce's decision that the 0.42 percent dumping margin was *de minimis*, because the agency showed unbroken practice of treating margins below 0.50 percent as *de minimis*, and because the agency supported its decision with findings made by the International Trade

Commerce determinations here do not satisfy this standard, because Commerce's explanations do not address why the evidence of Nails test is not sufficient *on this record,* do not address how the weighted average margins account for any masked dumping, and do not address how Commerce accounted for the fact that the test did not examine all U.S. sales. The failures are especially relevant in reviews. As Commerce has successfully argued in other litigation, annual reviews are conducted upon request only and determine the amount of duty that must be paid. Thus, they require greater specificity than investigations, justifying methodologies that offer "more accuracy" and inquiries that are more demanding than the "looser standards of the investigation." *Union Steel v. United States*, 823 F. Supp. 2d 1346, 1359 (Ct. Int'l Trade 2012), *aff'd*, 713 F.3d 1101, 1108 (Fed. Cir. 2013) (quoting the CIT).[23] Also, margins are generally far lower in annual reviews than margins in investigations.[24] These considerations further

---

(footnote continued from previous page)

Commission, and evidence in the record. *Washington Raspberries*, 859 F.2d at 903 & nn. 28-29.

[23] Commerce explained that it no longer calculates entry-specific margins in reviews. JA458, I&D Memorandum, page 14. This observation, however, does not detract from the observation that more precision is desired in reviews than in investigations.

[24] A review of company-specific margins for participants in the original investigations and first administrative reviews of 48 U.S. anti-dumping orders

undermine Commerce's decision to set aside the results of the Nails test as insufficient.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

WHEREFORE, Timken respectfully requests that the judgment of the Court of International Trade affirming Commerce's determination be reversed.

Respectfully submitted,

/s/ Geert De Prest

Terence P. Stewart
Geert De Prest
Lane S. Hurewitz

STEWART AND STEWART

Dated: July 15, 2014

Attorneys for Plaintiff-Appellant,
The Timken Company

---

(footnote continued from previous page)

from 1995 to 2005 revealed that dumping margins in the first review declined almost 80% of the time and those declines were often significant (up to 100%)." Terence P. Stewart & Amy S. Dwyer, *Comparative Overview of Anti-dumping Regulations in the European Communities and the United States of America*, in 4 *WTO – Trade Remedies: Max Planck Commentaries on World Trade Law* 804 n.65 (Martinus Nijhoff Publishers 2008).

# <u>ADDENDUM</u>

Opinion, Judgment and Order of The Honorable Jane A. Restani, *The Timken Company v. United States*, 968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014)

variations in pricing among different grades and concentration levels of sulfuric acid, RZBC has not provided sufficient evidence of such divisions within the sulfuric acid market. RZBC would need to demonstrate more clearly that including lower grades (and perhaps quantities) of sulfuric acid is inappropriate under the regulation. RZBC's reference to U.S. price quotes for non-technical grades of sulfuric acid and selected purchase documents are not sufficient. RZBC fails to establish that Commerce's benchmarks unreasonably distort the price of sulfuric acid.

Moreover, the court is unable to identify any authority indicating that Commerce's benchmark selection was improper. It appears to be consistent with past CVD determinations involving the PRC. *See Issue and Decision Memorandum* at 17 n. 12; *Preliminary Results*, 76 Fed. Reg. at 33,-232 n. 10. RZBC takes the stance that Commerce must use benchmark prices at the ten and eleven-digit level of specificity, which implies that Commerce must use benchmark prices that are nearly identical to RZBC's reported purchases to satisfy the regulation. RZBC Comments at 13. The regulation, however, does not manifest such a stringent standard. It requires only that the selected benchmarks be comparable. Considering that sulfuric acid is a commodity product, and that RZBC did not establish clear divisions within the sulfuric acid market, Commerce's selection of benchmark prices for sulfuric acid at the 4, 6, and 8 digit level is consistent with the regulation.

Commerce, for its part, did solicit benchmark information on two separate occasions and accepted world market prices from both petitioners and respondents. Although RZBC disputed Commerce's selection of benchmark prices, and cited some data to support its position, it

did not establish evidence sufficient to overcome the deferential standard of review that applies to Commerce's factual determinations. Ultimately, RZBC has not demonstrated that its proposed benchmark calculation is the only reasonable outcome on this administrative record. *See, e.g., Allied Tube and Conduit Corp. v. United States*, 24 CIT 1357, 1371, 127 F.Supp.2d 207, 220 (2000) ("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its factual conclusions as the only reasonable outcome."). Therefore, Commerce's determination on this issue is supported by substantial evidence.

## IV.  CONCLUSION

For the foregoing reasons, Commerce's *Remand Results* are sustained.  Judgment will be entered accordingly.



**The TIMKEN COMPANY, Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**NTN Bearing Corporation of America, NTN–SNR Roulements S.A., SNR Bearings USA, Inc., myonic GmbH, New Hampshire Ball Bearings, Inc., Schaeffler Italia S.r.l., SKF USA, Inc., SKF Industrie S.p.A., and Somecat S.p.A., Defendant–Intervenors.**

**Slip Op. 14–24.**

**Court No. 12–00415.**

United States Court of
International Trade.

Feb. 27, 2014.

**Background:** Importer filed suit challenging Department of Commerce's final re-

sults of administrative review of antidumping duty orders on ball bearings and parts thereof from France, Germany, and Italy. Importer moved for judgment on agency record.

**Holdings:** The Court of International Trade, Restani, J., held that:

(1) sufficiency test was not precluded by Commerce's prior practice;

(2) sufficiency test was adequately explained; and

(3) application of sufficiency test was reasonable.

Motion denied; sustained.

**1. Customs Duties ⚖21.5(3)**

Department of Commerce's prior practice did not preclude Commerce from applying sufficiency test, as additional step beyond targeted dumping test, by determining that volume and value of sales that passed targeted dumping test were insufficient as percentage of volume and value of all United States sales to warrant use of alternative average-to-transaction (A-T) methodology for comparing home market and export prices in administrative review of antidumping duty orders on ball bearings from France, Germany, and Italy; Commerce relied on antidumping provision stating that Commerce "may" use A-T methodology if statutory criteria were met, Commerce had previously stated that use of A-T methodology would be determined on case-by-case basis, and Commerce had applied sufficiency test in prior cases. Tariff Act of 1930, § 777A(d)(1)(B), 19 U.S.C.A. § 1677f–1(d)(1)(B).

**2. Customs Duties ⚖21.5(5)**

When making a discretionary antidumping determination, Department of Commerce can use a case-by-case analysis, so long as it is consistent with its statutory authority.

**3. Customs Duties ⚖21.5(3)**

Department of Commerce's application of sufficiency test, to determine that volume and value of sales that passed targeted dumping test were insufficient as percentage of volume and value of all United States sales to warrant use of alternative average-to-transaction (A-T) methodology for comparing home market and export prices, did not require explanation of amount of targeted sales that were considered to be sufficient, in administrative review of antidumping duty orders on ball bearings from France, Germany, and Italy; Commerce was never presented with and consequently did not consider importer's arguments requesting specification of and justification for sufficiency threshold, and percentages of sales that Commerce found to be targeted were very small. Tariff Act of 1930, § 777A(d)(1)(B), 19 U.S.C.A. § 1677f–1(d)(1)(B).

**4. Customs Duties ⚖21.5(3)**

Department of Commerce's application of sufficiency test reasonably used only sales that passed targeted dumping test as numerator and all United States sales as denominator, rather than including all sales to targeted groups in numerator, in determining sales that passed targeted dumping test were insufficient to warrant use of alternative average-to-transaction (A-T) methodology for comparing home market and export prices in administrative review of antidumping duty orders on ball bearings from France, Germany, and Italy; targeted dumping test defined what targeted sale was, so all sales to targeted groups were not required to be included in sufficiency test's numerator. Tariff Act of 1930, § 777A(d)(1)(B), 19 U.S.C.A. § 1677f–1(d)(1)(B).

———————

Geert M. De Prest, Stewart and Stewart, of Washington, DC, argued for plain-

tiff. With him on the brief were Terence P. Stewart and Lane S. Hurewitz.

Tara K. Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Whitney M. Rolig, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Diane A. MacDonald, Baker & McKenzie, LLP, of Chicago, IL, argued for defendant-intervenors NTN Bearing Corporation of America, NTN–SNR Roulements, S.A., and SNR Bearings USA, Inc. With her on the brief was Kevin M. O'Brien.

John M. Foote, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for defendant-intervenor Schaeffler Italia S.r.l. With him on the brief were Max F. Schutzman and Andrew T. Schutz.

Herbert C. Shelley, Steptoe & Johnson LLP, of Washington, DC, argued for defendant-intervenors SKF USA Inc., SKF Industrie S.p.A., and Somecat S.p.A. With him on the brief were Michael T. Gershberg, Laura R. Ardito, and Christopher G. Falcone.

Jay C. Campbell and Walter J. Spak, White & Case, LLP, of Washington, DC, for defendant-intervenors myonic GmbH and New Hampshire Ball Bearings, Inc.

### OPINION

RESTANI, Judge:

This matter is before the court on plaintiff The Timken Company's ("Timken") motion for judgment on the agency record pursuant to USCIT Rule 56.2. Timken challenges various aspects of the U.S. Department of Commerce's ("Commerce") final results rendered in the 2010–2011 review of the antidumping duty orders on ball bearings and parts thereof from France, Germany, and Italy. *Ball Bearings and Parts Thereof from France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011,* 77 Fed.Reg. 73,415 (Dep't Commerce Dec. 10, 2012) ("*Final Results*"). For the reasons stated below, the court sustains the *Final Results*.

### BACKGROUND

This case requires the court to resolve issues regarding Commerce's analysis of Timken's "targeted dumping" allegations against NTN–SNR Roulements S.A. ("NTN–SNR"), myonic GmbH ("myonic"), SKF Italy ("SKF"), and Schaeffler Italia S.r.l. ("Schaeffler") (collectively "the respondents"). Because the advent of "targeted dumping" allegations in administrative reviews is a recent development, it is necessary to provide some background on the statutory and regulatory framework regarding targeted dumping before addressing Timken's specific arguments in this case.

Until 2012, Commerce's default methodology for comparing home market and export prices in administrative reviews had been the average-to-transaction ("A–T") methodology. *See Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification,* 77 Fed.Reg. 8101, 8101 (Dep't Commerce Feb. 14, 2012) ("*Final Modification*"). When applying this methodology, Commerce did not allow transactions with export prices above the home market price to offset transactions with export prices below the home market price. *Id.* The disallowance of offsets is

**968 FEDERAL SUPPLEMENT, 2d SERIES**

commonly referred to as "zeroing." [1] On February 14, 2012, Commerce announced that it was changing its default comparison methodology in administrative reviews to the average-to-average ("A–A") methodology with offsets in order to comply with World Trade Organization ("WTO") decisions finding the use of zeroing in administrative reviews inconsistent with the United States' WTO obligations. *Id.* According to Commerce, this change meant that the default methodology in reviews essentially would mirror its WTO-compliant methodology in antidumping investigations. *Id.* Commerce, however, stated that it would consider the use of other comparison methodologies if the circumstances warranted and that it would examine the same criteria it examines in investigations to determine if another comparison methodology would be more appropriate. *Id.* at 8102. Commerce did not rule out the possibility of using a zeroing methodology if it found such circumstances. *See id.* at 8104, 8106–07.

As explained above, the default comparison methodology in investigations is the A–A methodology. *See also* 19 U.S.C. § 1677f–1(d)(1)(A) (2006).[2] The antidumping statute specifies that in an investigation, however, the A–T methodology may be used if there is "targeted dumping." Specifically, 19 U.S.C. § 1677f–1(d)(1)(B) provides:

> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

> (ii) the administering authority explains why such differences cannot be taken into account using [the A–A methodology or the T–T methodology].

The "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" is what is referred to as "targeted dumping." If Commerce finds targeted dumping and explains why the default A–A methodology cannot take account of the pattern, Commerce may use the A–T methodology to compare the home market and export prices. Commerce has used this statutory provision as guidance in deciding when to apply the A–T methodology (likely with zeroing) instead of the default A–A methodology in reviews. *See, e.g.,* Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Circular Welded Carbon Steel Pipes and Tubes from Turkey—May 1, 2010, through April 30, 2011, A–489–501, at 10 (Nov. 30, 2012), *available at* http://enforcement.trade.gov/frn/summary/turkey/2012–29529–1.pdf (last visited Feb. 20, 2014); Issues and Decision Memorandum for the Antidumping Duty

---

**1.** For a detailed explanation of the zeroing practice and its history, *see Union Steel v. United States,* 823 F.Supp.2d 1346 (CIT 2012).

**2.** Although the transaction-to-transaction ("T–T") methodology also is listed as a preferred methodology, Commerce, for practical reasons, rarely employs this methodology. *See*

19 C.F.R. § 351.414(c)(2) (2013) ("The Secretary will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.").

Administrative Reviews of Ball Bearings and Parts Thereof from France, Germany, and Italy; 2010–2011, A–427–801, A–428–801, A–475–801, at 11–12 (Dec. 4, 2012) ("*I & D Memo*"), *available at* http:// enforcement.trade.gov/frn/summary/ MULTIPLE/2012–29770–1.pdf (last visited Feb. 20, 2014).

Relevant to this case, Commerce has applied the so-called *Nails*[3] test to determine whether targeted dumping has occurred. The *Nails* test proceeds in two stages, each done on a product-specific basis (by control number or CONNUM). The first stage is referred to as the "standard-deviation" test. *I & D Memo* at 13. If 33% or more of the alleged targeted group's (i.e., customer, region, or time period) sales of subject merchandise are at prices more than one standard deviation below the weighted-average price of all sales under review, those sales pass the standard deviation test and are considered in step two—the "gap" test. *Id.* In performing the gap test, Commerce considers whether the "gap" between the weighted-average sales price to the targeted group and the weighted-average sales price to the next-highest non-targeted group is greater than the average gap between the non-targeted groups. *Id.* If the gap be-

tween the targeted group and the next-highest non-targeted group is greater than the average gap, those sales pass the gap test. *Id.* If more than 5% of total sales of the subject merchandise to the alleged target pass both tests, Commerce determines that targeting has occurred. *Id.*

Turning to the facts of the case at bar, this case arises out of Commerce's 2010–2011 review of antidumping duty orders on ball bearings and parts thereof from France, Germany, and Italy. *Final Results*, 77 Fed.Reg. at 73,415. While the reviews were proceeding, Commerce announced its change in default methodology for reviews. *See* Timken's Targeted Dumping Analysis for NTN–SNR at 1–2, A–427–801, PD 85 at bar code 3057972–01 (Feb. 21, 2012), ECF No. 47–2 (June 14, 2013). Timken, the petitioner before the agency, in anticipation of the possible application of the modified methodology to the reviews at bar, filed allegations of targeted dumping with Commerce against the respondents on February 21, 2012.[4] *See, e.g., id.* at 1–4.

Commerce's preliminary results did not rule on the targeted dumping allegation and applied the default A–A methodology, which resulted in zero dumping margins for each of the respondents. *Ball Bear-*

---

**3.** The *Nails* test derives its name from the cases in which it was first used. *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed.Reg. 33,977 (Dep't Commerce June 16, 2008); *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value*, 73 Fed.Reg. 33,‑985 (Dep't Commerce June 16, 2008). Commerce may be applying an entirely different test in future reviews. *See, e.g.,* Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Fifth Antidumping Duty Administrative Review, A–570–904, at 21–22 (Nov. 20, 2013), *available at* http://

enforcement.trade.gov/frn/summary/prc/ 2013–28359–1.pdf (last visited Feb. 20, 2014); Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2011–2012, A–489–501, at 38–39 (Dec. 23, 2012), *available at* http://enforcement.trade. gov/frn/summary/turkey/2013–31344–1.pdf (last visited Feb. 20, 2014). The court expresses no opinion on a test that was not employed in this case.

**4.** Timken had filed similar allegations in November 2011, before Commerce's change in methodology was finalized. *See I & D Memo* at 5.

*ings and Parts Thereof From France, Germany, and Italy: Preliminary Results of Antidumping Duty Administrative Reviews and Rescission of Antidumping Duty Administrative Reviews in Part,* 77 Fed.Reg. 33,159, 33,161, 33,164 (Dep't Commerce June 5, 2012). Commerce, however, invited the parties to comment on the targeted dumping allegations and the use of the new default methodology. *Id.* at 33,161–62.

Commerce issued post-preliminary determinations addressing the targeted dumping allegations on October 16, 2012. Post–Preliminary Analysis and Calculation Memorandum, A–427–801, PD 109 at bar code 3101431–01 (Oct. 16, 2012), ECF No. 47–2 (June 14, 2013) ("*Post–Preliminary Results*"). In its analysis, Commerce applied the *Nails* test to determine whether targeted dumping had occurred. *See id.* at 2–3. Commerce found sales that passed both stages of the *Nails* test for each respondent. *Id.* at 3; Timken's Comments on the Post–Preliminary Targeted Dumping Analysis for NTN–SNR at 2, A–427–801, PD 120 at bar code 3104304–01 (Nov. 5, 2012), ECF. No. 47–2 (June 14, 2013) ("*Timken's Post–Preliminary Comments for NTN–SNR*"). In these reviews, Commerce compared the number of sales that passed the *Nails* test to all U.S. sales for each respondent. *See* Post–Preliminary Results Analysis for NTN–SNR at 2, A–427–801, PD 110 at bar code 3101689–01 (Oct. 16, 2012), ECF No. 47–2 (June 14, 2013) ("*Post–Preliminary Analysis for NTN–SNR*"); Post–Preliminary Results Analysis for myonic GmbH at 2, A–428–801, PD 89 at bar code 3101703–01 (Oct. 16, 2012), ECF No. 47–3 (June 14, 2013) ("*Post–Preliminary Analysis for myonic*"); Post–Preliminary Results Analysis for Schaeffler at 2, A–475–801, PD 151 at bar code 3101554–01 (Oct. 16, 2012), ECF No. 47–3 (June 14, 2013) ("*Post–Preliminary Analysis for Schaeffler*"); Post–Pre-

liminary Results Analysis for SKF at 2, A–475–801, PD 155 at bar code 3101698–01 (Oct. 16, 2012), ECF No. 47–3 (June 14, 2013) ("*Post–Preliminary Analysis for SKF*"). For each respondent, Commerce determined that the volume and value of sales that passed the *Nails* test was insufficient as a percentage of the volume and value of all U.S. sales to warrant the use of the alternative A–T methodology. *See Post–Preliminary Analysis for NTN–SNR* at 2; *Post–Preliminary Analysis for myonic* at 2; *Post–Preliminary Analysis for Schaeffler* at 2; *Post–Preliminary Analysis for SKF* at 2.

Timken filed comments with Commerce challenging Commerce's decision to engage in this additional step beyond the two-part *Nails* test and Commerce's use of only the sales that passed the *Nails* test to determine the significance of the targeted dumping. *See, e.g., Timken's Post–Preliminary Comments for NTN–SNR.* Following comments by the parties and a hearing, Commerce issued its final results. *Final Results,* 77 Fed.Reg. at 73,415. Commerce again determined that the volume and value of targeted sales for each respondent was insufficient to consider using the A–T methodology. *See I & D Memo* at 10, 12–15. Commerce therefore applied the default A–A methodology and again found dumping margins of zero for each respondent. *See I & D Memo* at 10; *Final Results,* 77 Fed.Reg. at 73,416. Timken challenges Commerce's analysis of its targeted dumping allegations on several grounds, each of which will be discussed below. Defendant-intervenors argue that Commerce's determination should be sustained.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). "The court shall hold

unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law…." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Consistency with Past Practice

The bulk of Timken's argument is that Commerce's decision to compare the results of the *Nails* test to total sales before considering the use of the A–T methodology is inconsistent with Commerce's past practice in applying the *Nails* test. *See* Timken Co.'s Mem. in Supp. of Its Rule 56.2 Mot. for J. on the Agency R., ECF No. 46, 16–33 ("Timken Br."). According to Timken, once Commerce had found sales that passed the *Nails* test, in prior cases it automatically considered whether the use of the A–T methodology was appropriate by comparing the dumping margins calculated using the A–A methodology to the margins calculated using the A–T methodology. *Id.* at 17–19. Timken alleges that Commerce had explicitly declined in four other cases to engage in a de minimis inquiry in determining whether a pattern exists for purposes of 19 U.S.C. § 1677f–1(d)(1)(B).[5] *Id.* at 18–22 (citing Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Multilayered Wood Flooring from the People's Republic of China, A–570–970 (Oct. 11, 2011) ("*Wood Flooring from China*"), *available at* http://enforcement.trade.gov/frn/summary/prc/2011–26932–1.pdf (last visited Feb. 20, 2014); Issues and Decision Memorandum

for the Less than Fair Value Investigation of Certain Steel *Nails* from the United Arab Emirates, A–520–804 (Mar. 19, 2012) ("*Nails from the UAE II*"), *available at* http://enforcement.trade.gov/frn/summary/uae/2012–7067–1.pdf (last visited Feb. 20, 2014); High Pressure Steel Cylinders from the People's Republic of China: Issues and Decision Memorandum for the Final Determination, A–570–977 (Apr. 30, 2012) ("*Steel Cylinders from China*"), *available at* http://enforcement.trade.gov/frn/summary/prc/2012–10952–1.pdf (last visited Feb. 20, 2014); Issues and Decision Memorandum for the Antidumping Duty Investigation of Large Residential Washers from the Republic of Korea, A–580–868 (Dec. 18, 2012) ("*Washers from Korea*"), *available at* http://enforcement.trade.gov/frn/summary/korea–south/2012–31104–1.pdf (last visited Feb. 20, 2014)). Because Commerce allegedly failed to provide a proper explanation for this change in practice, Timken argues that remand is necessary. *Id.* at 22–33.

The government argues that Commerce's decision in this case is consistent with its prior reasoning. *See* Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 59, 12–16 ("Government Br."). Commerce cited a prior case in which it engaged in a similar sufficiency analysis even after some sales had passed the *Nails* test. *I & D Memo* at 13–14 (citing *Certain Stilbenic Optical Brightening Agents From Taiwan: Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination,* 76 Fed.Reg. 68,154, 68,156 (Dep't Commerce Nov. 3, 2011) ("*OBAs*

---

**5.** Timken and several of the defendant-intervenors refer to Commerce's sufficiency determination as a de minimis test. *See, e.g.,* Timken Br. 34–35; Resp. of NTN Bearing Corp. of Am., et al., to the Rule 56.2 Mots. of the Timken Co., ECF No. 57, 13. The government denies that Commerce created a de min-

imis test. Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 59, 12. Because of this disagreement regarding the use of the term "de minimis," the court will refer to Commerce's determination as a sufficiency determination.

*from Taiwan* ")). Commerce noted that it had previously indicated that it would proceed on a case-by-case basis in determining when to use the A–T methodology and explained that its prior cases did not preclude the analysis undertaken here. *See id.* at 11, 13–15. Commerce further noted that 19 U.S.C. § 1677f–1(d)(1)(B) states that Commerce "may" use the A–T methodology if it finds targeted dumping, but it is not required to do so. *Id.* at 14. The government argues that Commerce's determination was a reasonable exercise of its discretion and otherwise in accordance with law. Government Br. 16–19.

SKF argues that Commerce had no duty to explain any departure from the cases cited by Timken. *See* Resp. Br. of SKF USA Inc., SKF Industrie S.p.A., and Somecat S.p.A. Opposing the Rule 56.2 Mot. of the Timken Co., ECF No. 53, 9–15 ("SKF Br."). SKF notes that the cases cited by Timken were all investigations, whereas this case involves a review. *Id.* at 10–11. SKF argues that to the extent that Commerce's practice in investigations

might be relevant, three prior decisions[6] do not reflect a well-established practice from which a departure must be explained. *Id.* at 12–14. SKF additionally argues that because Commerce's practice with regard to targeted dumping was in a state of flux and Commerce had stated that it intended to proceed on a case-by-case basis in this area, there could be no presumption of continuity. *Id.* at 14–15.

Schaeffler claims that Timken's arguments based on past practice fail to recognize Commerce's ability to adapt and change its practices and argues that the alleged change here was a relatively minor evolution from previous cases. Resp. of Def.-Intervenor Schaeffler Italia S.r.l. to Pl.'s Mem. in Supp. of Its Rule 56.2 Mot., ECF No. 54, 12–14 ("Schaeffler Br."). NTN–SNR, citing *OBAs from Taiwan*, argues that Commerce's decision is in line with past practice. Resp. of NTN Bearing Corp. of Am., et al., to the Rule 56.2 Mots. of the Timken Co., ECF No. 57, 13 ("NTN–SNR Br.").[7]

---

**6.** The final determination in one of the four cases cited by Timken, *Washers from Korea*, was published in the Federal Register approximately two weeks after Commerce's final determination in the challenged reviews. *Compare Final Results*, 77 Fed.Reg. at 73,415 (dated December 10, 2012), *with Notice of Final Determination of Sales at Less than Fair Value: Large Residential Washers From the Republic of Korea*, 77 Fed.Reg. 75,988 (Dep't Commerce Dec. 26, 2012).

**7.** NTN–SNR also argues that the results ultimately should be affirmed because Commerce lacked the authority to engage in the targeted dumping analysis at all. *See* NTN–SNR Br. 3–11. NTN–SNR first argues that 19 U.S.C. § 1677f–1(d) limits the targeted dumping analysis to investigations. *Id.* at 3–9. NTN–SNR claims that because the targeted dumping inquiry is described only in the subsection entitled "Investigations" and is absent in the subsection entitled "Reviews," Congress clearly intended for the targeted dumping analysis to be limited to investigations. *Id.* NTN–SNR also argues that Commerce's tar-

geted dumping analysis was based on improperly submitted information, in that Timken first filed targeted dumping allegations in November 2011, several months before Commerce's February 2012 Final *Modification* announcing the change in default methodology for reviews. *Id.* at 9–11. NTN–SNR requests that the court reverse Commerce's determination that it may conduct a targeted dumping analysis in a review and order that Timken's targeted dumping allegations be removed from the record. *Id.* at 15.

Even assuming that NTN–SNR may succeed on an argument contrary to that advanced by the agency to support the outcome reflected in the *Final Results, see SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."), the court finds these arguments unpersuasive. Turning to NTN–SNR's first argument, 19 U.S.C. § 1677f–1(d)(2), the subsection entitled "Reviews," does nothing more than clarify how

The court notes that Commerce's inconsistency in its explanations has generated quite a bit of confusion that is reflected in the briefing of this case. Much of the briefing in this case treated Commerce's sufficiency determination as part of finding the requisite pattern in 19 U.S.C. § 1677f–1(d)(1)(B). This is understandable because Commerce made statements in the record indicating that this was the basis for continuing to use the A–A methodology. *See, e.g., Post–Preliminary Analysis for NTN–SNR* at 2; *I & D Memo* at 10 ("We continue to find, for each respondent, that a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods does not exist...."). Other parts of the record, however, indicate that Commerce found a pattern of significant differences, but did not find the pattern sufficient to invoke its discretionary authority. *See, e.g., Post–Preliminary Results* at 3 ("The Department preliminarily finds, for each respon-

dent, that the pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods is insufficient to consider whether the standard comparison method can account for the alleged targeted dumping."); *I & D Memo* at 13 (stating that Commerce determines that targeting has occurred once sales have passed both prongs of the *Nails* test); *id.* at 14 (noting that § 1677f–1(d)(1)(B)'s inclusion of the word "may" indicates that Commerce is not required to use the A–T methodology even if both prongs of the *Nails* test are satisfied). The government clarified at oral argument and in its supplemental briefing that the *Nails* test finds the requisite pattern and that Commerce's sufficiency determination was made pursuant to its discretionary authority granted by the word "may" in § 1677f–1(d)(1)(B). *See* Def.'s Supplemental Filing Responding to the Ct.'s Questions Regarding Targeted Dumping, ECF No. 81, 7 ("Government Supplemental

Commerce should proceed when it decides to use the A–T methodology (namely, that it should use monthly averages). Section 1677f–1(d)(2) is otherwise completely silent as to how Commerce should conduct its determination of less than fair value in reviews, leaving Commerce substantial discretion as to the methodologies it wishes to employ. *See Union Steel v. United States,* 823 F.Supp.2d 1346, 1359–60 (CIT 2012), *aff'd,* 713 F.3d 1101 (Fed.Cir.2013). NTN–SNR's reliance on *FAG Italia S.p.A. v. United States,* 291 F.3d 806 (Fed.Cir.2002), is misplaced. In that case, the Court of Appeals for the Federal Circuit ("Federal Circuit") determined that 19 U.S.C. § 1675(a)(4), which authorizes Commerce to make a duty absorption inquiry in the second and fourth administrative reviews of orders entered after the Uruguay Round Agreements Act (URAA) came into effect, did not authorize Commerce to make a similar determination in other years or in reviews of orders entered before the URAA came into effect. *Id.* at 818–19. The Federal Circuit stressed, however, that Commerce lacked a general authority to act that would

have authorized Commerce to engage in the disputed inquiry despite the limited scope of 19 U.S.C. § 1675(a)(4). *Id.* at 818 n. 18. Commerce certainly has a general authority to conduct an administrative review, and NTN–SNR has failed to put forward any limitation on that authority except for its reference to § 1677f–1(d). As explained above, that section does nothing more than clarify that the averaging period in reviews should be monthly. It places no other limits on the methodologies that Commerce may employ in reviews, leaving Commerce discretion as to the choice of methodologies.

In the light of this broad discretion, Commerce acted reasonably and did not abuse its discretion by basing its practice in reviews on its practice in investigations, which includes the use of the targeted dumping analysis. The court rejects NTN–SNR's second argument because Commerce ultimately based its analysis on Timken's renewed targeting allegations, which were submitted after Commerce had published its *Final Modification. See I & D Memo* at 15.

**1288**          **968 FEDERAL SUPPLEMENT, 2d SERIES**

Br."). Because the government's position is rooted in statements made by Commerce on the record, the court will treat the sufficiency determination as part of Commerce's exercise of its discretionary authority based on the word "may." *See Ceramica Regiomontana, S.A. v. United States,* 810 F.2d 1137, 1139 (Fed.Cir.1987) ("A court may uphold an agency's decision of less than ideal clarity if the agency's path may reasonably be discerned." (internal quotation marks and brackets omitted)).

[1] Treating the sufficiency determination in this case as rooted in Commerce's discretionary authority, the court finds little, if any, inconsistency with the cases cited by Timken. First, the language cited by Timken from *Wood Flooring from China* appears to be directed at the issue of whether the A–T methodology should be applied to all sales or only targeted sales. *See Wood Flooring from China* at 32–33. Commerce's reasoning for applying the A–T remedy to all sales is distinct from the issue of whether Commerce should consider the use of the A–T methodology at all.

The language in *Nails from the UAE II* likewise is not instructive as to how Commerce should exercise its discretion. In that case, Commerce explained:

In calculating margins, pursuant to section 777A(d)(1)(B)(i) of the Act the Department may use the A–T comparison methodology if "there is a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time." This statutory language *does not establish how a pattern of prices should be measured* in terms of the prevalence of underlying sales in relation to all sales. Instead, the statute states that there must be a variance in export prices among purchasers, regions, or periods of time, and that the variance must exhibit

a pattern. Thus, *the task of finding a pattern* involves determining the frequency of low prices in a given group of sales, and not whether the sales in that group were frequent in relation to all sales. . . .

Dubai Wire and Precision did not demonstrate why the prices for products corresponding to a small percentage of overall sales *cannot be found to exhibit a pattern* under the statute. We find that the methodology underlying our targeted dumping test *in identifying a pattern* of prices pursuant to section 777A(d)(1)(B)(i) of the Act is reasonable. As indicated correctly by interested parties, this methodology has also withstood judicial scrutiny. Lastly, the targeted sales are not likely to account for a significant portion of sales because, by definition, targeting is an act of selectively pursuing a specific market segment or product.

*Nails from the UAE II* at 14–15 (emphases added) (citation omitted). This language clearly deals with whether the statutory definition of "pattern" has been met. As explained above, however, Commerce found a pattern using the *Nails* test, but Commerce exercised its discretion because the pattern was not sufficient to warrant considering or applying the A–T methodology. The language from *Nails from the UAE II* does not address Commerce's use of that discretion.

Similarly, the language in *Steel Cylinders from China* addresses the definition of "pattern" as that term is used in 19 U.S.C. § 1677f–1(d)(1)(B). *Steel Cylinders from China* at 31 ("This statutory language *does not establish how a pattern of prices should be measured* in terms of the prevalence of underlying sales in relation to all sales. Instead, the statute states that there must be a pattern of prices that differ among purchasers, regions, or peri-

ods of time, and that the difference must be significant. Thus, *the task of finding a pattern* under the *Nails* test involves determining the frequency of low prices in a given group of sales, and not whether the sales in that group were frequent in relation to all sales." (emphases added)).

The language cited by Timken in *Washers from Korea*, which was published after the *Final Results* in this case, is even less helpful to Timken. Again the language focused on by Timken deals with the pattern requirement. *See Washers from Korea* at 22–23 ("As we stated in *UAE Nails II*, the statutory language of section 777A(d)(1)(B)(i) of the Act *does not establish how a pattern of prices should be measured* in terms of the prevalence of underlying sales in relation to all sales. Instead, the statute states that there must be a variance in export prices among purchasers, regions, or periods of time, and that the variance must exhibit a pattern." (emphasis added)). But Commerce also stated: "If we determined that a sufficient volume of U.S. sales were found to have passed the *Nails* test, then the Department considered whether the average-to-average method could take into account the observed price differences." *Id.* at 20. Commerce further explained:

> With respect to the respondents' contention that the Department should apply a *de minimis* threshold before invoking the average-to-transaction method, we note that the Department has also addressed this argument in previous cases. As we discussed above, we considered the volume of U.S. sales that passed the *Nails* test. However, the Department does not employ a de minimis threshold but rather makes its determination on a case-by-case basis.

*Id.* at 22 (citation omitted). These latter statements are entirely consistent with

Commerce's methodology and analysis in this case.

Commerce also cited *OBAs from Taiwan* as a prior case in which it conducted an additional test beyond the *Nails* test before considering the use of the A–T methodology. *I & D Memo* at 14. In that case, Commerce determined that the number of sales that passed the *Nails* test "was insufficient to establish a pattern of export prices for comparable merchandise that differ significantly among certain customers or regions." *OBAs from Taiwan*, 77 Fed.Reg. at 17,028. Although this is framed as part of the pattern inquiry and Commerce justifies its actions in this case on the word "may," *OBAs from Taiwan* lends support to Commerce's assertion that it previously had considered the number of sales that passed the *Nails* test before considering whether the A–T methodology was appropriate.

The cases supposedly supporting Timken's argument (*Wood Flooring From China*, *Nails from the UAE II*, and *Steel Cylinders from China*) thus are mostly, if not entirely, irrelevant to the issue in this case because they address different aspects of the targeted dumping analysis. One case cited by Timken (*Washers from Korea*) even contains the same analysis that Commerce engaged in during this case, and Commerce pointed to a case (*OBAs from Taiwan*) in which Commerce engaged in a similar analysis as part of the pattern inquiry. Based on these cases, the court is unable to agree with Timken that Commerce's actions were precluded by its prior cases.

[2] To the extent that some of the reasoning in the discussed cases might be construed as inconsistent with Commerce's actions in this case, the court finds such minor inconsistency insufficient to conclude that Commerce abused the discretion granted to it in selecting an alterna-

tive methodology. The statute used by Commerce for guidance in conducting a targeted dumping analysis in reviews states that Commerce "may" use the A–T methodology if the statutory criteria are met. 19 U.S.C. § 1677f–1(d)(1)(B). And Commerce stated in the *Final Modification* that it would "determine on a case-by-case basis whether it is appropriate to use an alternative comparison methodology" in reviews. 77 Fed.Reg. at 8102. "When making a discretionary determination, . . . Commerce can use a case-by-case analysis, so long as it is consistent with its statutory authority." *Qingdao Taifa Grp. Co. v. United States,* 780 F.Supp.2d 1342, 1350 (CIT 2011) (internal quotation marks omitted). Even if Commerce's analysis conflicts with its prior cases, "Commerce is not required to justify its determination in terms of past alternatives," as long as it acts reasonably. *Id.* Timken's allegations that Commerce's application of the test was unreasonable will be addressed below, but the court holds that Commerce's prior practice did not preclude it from engaging in a sufficiency determination as part of its exercise of discretionary authority.

## II. Commerce's Alleged Failure to Explain Its Application of the Sufficiency Test

Timken next argues that Commerce failed to explain the purpose of its additional sufficiency test and failed to state and justify the amount of targeted sales it considers "sufficient." Timken Br. 34–35. Because Commerce failed to provide this reasoning, Timken argues that remand is necessary. *See id.* at 35.

The government explains that Commerce has discretion in deciding whether to apply the A–T methodology even if targeting is found, that Commerce engaged in the challenged additional step to determine whether the pattern found by the *Nails* test was sufficient to exercise that discretion, and that Commerce has not established a de minimis threshold, but rather is proceeding on a case-by-case basis in deciding when to exercise its discretion. Government Br. 11–14. The government additionally argues that Commerce's sufficiency determination in this case was reasonable because Commerce is not obligated to justify relying on the default comparison methodology (i.e., the A–A methodology) and Commerce's experience in conducting the *Nails* test informed its judgment in making that determination. *Id.* at 17–18.

Schaeffler argues that Commerce enjoys broad discretion in determining whether to apply the A–T methodology and that "[a]ny reasonable mind would accept that the minimal number and value of Schaeffler's qualifying sales supports Commerce's conclusion that Schaeffler had not engaged in a pattern of targeted dumping." Schaeffler Br. 10–11. Schaeffler also argues that this additional step is necessary because Commerce could otherwise impose the "draconian remedy" of applying the A–T methodology with zeroing to all sales even though very few sales passed the *Nails* test. *Id.* at 15. NTN–SNR and SKF urge that an additional inquiry is needed to determine whether the amount of sales that pass the *Nails* test truly can be considered a pattern. NTN–SNR Br. 12–14; SKF Br. 23–24. SKF additionally argues that Commerce should be given wide discretion in defining "pattern" on a case-by-case basis and should not be required to set a specific threshold. SKF Br. 24–25

As explained above, Commerce is relying on the word "may" in the statute. With this established, Commerce's sufficiency determination easily can be understood as a methodology by which Commerce decides whether to exercise that

discretion. If a relatively insignificant number of sales are identified as targeted, Commerce exercises its discretion and continues to apply the A–A methodology. *See I & D Memo* at 13–14; Government Supplemental Br. 7.[8] The sufficiency test thus serves as a tool to guide Commerce's exercise of its discretion in choosing whether to depart from its normal practice of using the A–A methodology.

[3] Regarding Timken's argument that Commerce has failed to provide any explanation regarding what amount of targeted sales it considers to be "sufficient," the court has reviewed the record and has concluded that Timken did not present its arguments to Commerce in a manner that compelled Commerce to define a level of sufficiency with specificity. In its post-preliminary results, Commerce made specific findings regarding the percentage of sales by value and by volume that passed the *Nails* test. *See Post–Preliminary Analysis for NTN–SNR* at 2; *Post–Preliminary Analysis for myonic* at 2; *Post–Preliminary Analysis for Schaeffler* at 2; *Post–Preliminary Analysis for SKF* at 2.

The court notes that by either measure, the percentages of sales found to be targeted were very small. *See* Timken Co.'s Mem. in Supp. of its Rule 56.2 Mot. for J. on the Agency R., ECF No. 44, 33, 40 (confidential version). In its comments to Commerce following the post-preliminary results, Timken challenged Commerce's decision to engage in this additional inquiry, but Timken did not argue that the percentages found should be considered sufficient, nor did Timken argue that Commerce erred by failing to set and justify a specific sufficiency threshold. *See Timken's Post–Preliminary Comments for NTN–SNR;* Timken's Comments on Commerce's Targeting Analysis for Schaeffler and SKF, A–475–801, PD 162 at bar code 3104350–01 (Nov. 5, 2012), ECF No. 47–3 (June 14, 2013) ("*Timken's Post–Preliminary Comments for Schaeffler and SKF* "); Timken's Comments on Commerce's Targeting Analysis for myonic GmbH, A–428–801, CD 39 at bar code 3104315–01 (Nov. 5, 2012), ECF No. 48 (June 14, 2013) ("*Timken's Post–Preliminary Comments for myonic* "). Because Commerce was never

---

8. As Schaeffler notes, the reasonableness of making a sufficiency determination would appear to be buttressed by Commerce's practice of applying the A–T methodology with zeroing to all of the respondent's sales, not just those that passed the *Nails* test. *See, e.g., Wood Flooring from China* at 31. Before applying this "remedy" to all of the respondent's U.S. sales, it would appear reasonable for Commerce to consider whether the amount of targeted sales forming the justification for applying that remedy represents a significant portion of the respondent's U.S. sales.

The court notes that a recent opinion of the court held that Commerce's withdrawal of the so-called "Limiting Rule," 19 C.F.R. § 351.414(f)(2) (2007), which limited the A–T remedy in investigations to only targeted sales, violated the Administrative Procedure Act, 5 U.S.C. § 553. *Gold E. Paper (Jiangsu) Co. v. United States*, 918 F.Supp.2d 1317, 1327–28 (CIT 2013). Thus, until the amended regulation is renoticed, the A–T remedy

likely should be limited to only those sales that pass the *Nails* test, at least in investigations. The court observes, however, that Commerce has continued to apply the A–T methodology with zeroing to all sales in administrative reviews even after *Gold East Paper*, relying in part on the fact that 19 C.F.R. § 351.414(f) referenced only investigations. *See, e.g.,* Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Stainless Steel Plate in Coils from Belgium; 2011–2012, A–423–808, at 3 (Dec. 23, 2013), *available at* http://enforcement.trade.gov/frn/summary/belgium/2013–31345–1.pdf. Should the Limiting Rule be applied to reviews, Schaeffler's arguments regarding the "draconian remedy" of applying the A–T methodology with zeroing to all sales would be rendered moot. In any case, the sufficiency test is justified as a tool in guiding Commerce's discretionary authority based on the record now before the court.

presented with (and consequently did not consider) arguments asking it to specify and justify a sufficiency threshold, because Timken never argued that the specific percentages found should be considered sufficient, and because the percentages were small, this argument fails.

### III.   Comparison of Sales that Passed the *Nails* Test to All U.S. Sales

[4]   Finally, Timken argues that the use of the sales that passed the *Nails* test as the numerator and all U.S. sales as the denominator in the "ratio" Commerce used in its sufficiency determination is illogical. Timken Br. 36–41. First, Timken argues that because the *Nails* test considers only products sold to an alleged target that are identical to products sold to a non-target, the numerator and denominator used in this case were inconsistent. *Id.* at 37–38. Timken reasons that products that are sold to only the targeted customer cannot be considered in Commerce's application of the *Nails* test (because there are no nontargeted sales of the same product to compare the prices with), and a numerator drawn from only identical sales is inconsistent with a denominator that includes all sales. *Id.* Next, Timken argues that the *Nails* test finds only evidence of targeted dumping but does not find all targeted sales. *See id.* at 38–40. According to Timken, because the *Nails* test does not identify all targeted sales, using the results of the *Nails* test to determine the extent of targeted dumping is unreasonable. *Id.* Timken suggests that a more reasonable comparison would be to treat all sales to the targeted groups identified by the *Nails* test as targeted sales, and compare that number to total U.S. sales. *Id.* at 40.

The government recognizes that the *Nails* test is limited to comparing sales of identical merchandise, but it argues that

Timken has not explained how using comparable merchandise when conducting the *Nails* test would be feasible or preferable to using identical merchandise. Government Br. 20–21. The government counters Timken's arguments that the *Nails* test fails to find all targeted sales by noting that Timken has cited to nothing in the record showing that the *Nails* test is illsuited to evaluating the pricing patterns in this case. *Id.* at 21. Commerce rejected Timken's suggestion that all sales to the targeted groups be included in the numerator by explaining that only those sales that passed the *Nails* test rightfully can be considered "targeted." *I & D Memo* at 14. SKF characterizes and criticizes Timken's argument as an attack on the ability of the *Nails* test to identify all targeted sales. *See* SKF Br. 26–30.

The court rejects Timken's claims of inconsistency between the numerator and denominator based upon the *Nails* test's use of only identical merchandise, because Timken has failed to show that this inconsistency actually exists on this record to such an extent that Commerce's use of the ratio was unreasonable. The court notes that Timken's arguments regarding the ratio before Commerce never addressed the possibility that the use of only identical sales in the numerator of the ratio while including all sales in the denominator could create a material inconsistency affecting Commerce's interpretation of the data. *See Timken's Post–Preliminary Comments for NTN–SNR; Timken's Post–Preliminary Comments for Schaeffler and SKF; Timken's Post–Preliminary Comments for myonic.* Before the court, Timken never referenced any record evidence suggesting that Commerce's use of this ratio would be unreasonable in these particular reviews because of this alleged discrepancy until its response to the government's and defendant-intervenors' supplemental briefs following oral argument.

*See* Resp. to Def.'s and Def.-Intervenors' Supplemental Brs., ECF No. 86, 4 n. 8. Even this late evidence was quite meager, as it was dropped in a footnote and discussed the potential distortion for only one of the four respondents. *See id.* Thus, Timken has failed to challenge Commerce's determination with anything more than hypotheticals, and the court will not disturb Commerce's determination on that basis. *See Borden, Inc. v. United States,* 23 CIT 372, 379, 1999 WL 397968 (1999), *rev'd on other grounds,* 7 Fed.Appx. 938 (Fed.Cir.2001).

Timken's argument that the *Nails* test fails to find all targeted sales and thus its results should not be used to determine the extent of targeting, however, was presented to Commerce. The court nevertheless finds this argument unavailing.

Timken argues that the *Nails* test is useful only as a tool to identify whether targeting occurred, not as a tool for identifying targeted sales. *See* Timken Br. 40. There is nothing in the antidumping statute, however, defining a "targeted sale." Commerce uses the *Nails* test to find a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" pursuant to 19 U.S.C. § 1677f–1(d)(1)(B)(i). *See I & D Memo* at 12–13. Commerce's use of the *Nails* test to define that pattern has been affirmed by the court as a reasonable interpretation of the statute. *Mid Continent Nail Corp. v. United States,* 712 F.Supp.2d 1370, 1378–79 (CIT 2010) ("*Mid Continent Nail*"). Commerce treats only those sales that pass both prongs of the *Nails* test as forming the "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and consequently considers only those sales to be "targeted." *I &*

*D Memo* at 14. Thus, Timken's arguments regarding the ability of the *Nails* test to uncover all targeted sales ultimately amount to an attack on the *Nails* test itself. The court previously upheld the *Nails* test as a reasonable interpretation of the statute in *Mid Continent Nail* in the face of challenges similar to those advanced by Timken and sees no reason to depart from that decision now. *See* 712 F.Supp.2d at 1378–79 (rejecting claims that "Commerce's use of thirty-three percent in its 'pattern' definition and five percent in its 'differ significantly' definition are seemingly random values with no meaning" that "cause the nails test to overlook obvious targeting").

Because the *Nails* test defines what is a "targeted" sale, Commerce reasonably rejected Timken's suggestion that all sales to the targeted group(s) be included in the numerator. The sales that did not pass the *Nails* test are by definition not part of the pattern identified pursuant to 19 U.S.C. § 1677f–1(d)(1)(B)(i). *I & D Memo* at 14. In determining whether the identified pattern is sufficient to warrant consideration of the A–T methodology, it would make little sense for Commerce to include sales that did not form part of that pattern in the numerator of the ratio. Commerce's decision to use only those sales that passed the *Nails* test as the numerator thus was reasonable and in accordance with law.

## CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are SUSTAINED. Judgment will issue accordingly.



## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **THE TIMKEN COMPANY,** |
|          Plaintiff, |
|          v. |
| **UNITED STATES,** |
|          Defendant, |
| **NTN BEARING CORPORATION OF AMERICA, NTN-SNR ROULEMENTS S.A., SNR BEARINGS USA, INC., MYONIC GMBH, NEW HAMPSHIRE BALL BEARINGS, INC., SCHAEFFLER ITALIA S.R.L, SKF USA, INC., SKF INDUSTRIES S.P.A., and SOMECAT S.P.A.,** |
|          Defendant-Intervenors. |

**Before: Jane A. Restani, Judge**

**Consol. Court No. 12-00415**

### <u>JUDGMENT</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED, and DECREED that the <u>Final Results</u> by the United States Department of Commerce are SUSTAINED.

                   __/s/ Jane A. Restani__
                     Jane A. Restani
                         Judge

Dated: February 27, 2014
       New York, New York

## **Proof of Service**

I hereby certify that on July 16, 2014, copies of the **corrected non-confidential (public) version** of The Timken Company's Initial Brief were electronically served *via* the Court's CM/ECF system upon the following parties:

**On Behalf of The United States:**
Tara K. Hogan, Esq.
**U.S. DEPARTMENT OF JUSTICE**
Commercial Litigation Branch -
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
E-mail: tara.hogan@usdoj.gov

**On Behalf of SNR Roulements and NTN Corporation and SNECMA**:
Kevin M. O'Brien, Esq.
**BAKER & McKENZIE LLP**
815 Connecticut Ave., N.W.
Suite 900
Washington, DC 20006-4078
E-mail:
kevin.obrien@bakermckenzie.com

**On Behalf of the SKF Group Companies:**
Herbert C. Shelley, Esq.
**STEPTOE & JOHNSON LLP**
1330 Connecticut Ave., N.W.
Washington, DC 20036-1795
E-mail: hshelley@steptoe.com

**On Behalf of the Schaeffler Group:**
Max F. Schutzman, Esq.
**GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP**
399 Park Avenue
25th Floor
New York, NY 10022
E-mail: mschutzman@gdlsk.com

/s/ Geert De Prest
Geert De Prest

## Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface (14 point font, Times New Roman).

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the requirement of Fed. R. App. P. 32(a)(7)(B)(i). Specifically, excluding those exempted portions of the brief, as set forth in Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 9,296 words.  In accordance with Fed. R. App. P. 32(a)(7)(C), this certified word count is based on the word count feature in the word processing system (Microsoft Word) used in preparing this brief.

/s/ Geert De Prest

Geert De Prest

Stewart and Stewart
2100 M Street, NW, Suite 200
Washington, DC  20037
Tel.:  (202) 785-4185
E-mail:
gdeprest@stewartlaw.com

Counsel for Plaintiff-Appellant,
The Timken Company

July 15, 2014